[No. C045792. Third Dist. Nov. 17, 2006.]

OAKLAND RAIDERS, Plaintiff and Appellant, v.
OAKLAND-ALAMEDA COUNTY COLISEUM, INC., Defendant and
Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III. and VI. of the Discussion.

COUNSEL

Howard Rice Nemerovski Canady Falk & Rabkin, Jerome B. Falk, Jr., Kenneth G. Hausman, Douglas A. Winthrop, Jonathan W. Hughes; Dreyer, Babich, Buccola & Callaham, Roger A. Dreyer; and Jeffrey E. Birren for Plaintiff and Appellant.

Morrison & Foerster, Shirley M. Hufstedler, James J. Brosnahan, George C. Harris, Angela L. Padilla, Arturo J. Gonzalez, Benjamin J. Fox and Melissa A. Jones for Defendant and Appellant.

OPINION

**BUTZ, J.**—A jury awarded plaintiff Oakland Raiders, a California limited partnership (the Raiders) $34.2 million in damages against defendant Oakland-Alameda County Coliseum, Inc., a California nonprofit corporation (OACC) on the Raiders' claim for negligent misrepresentation regarding the status of season ticket sales, representations that were allegedly made to induce the team to leave Los Angeles and sign a long-term contract to play at their former home in Oakland. The size of the jury award was only a fraction of the amount of compensatory damages the Raiders had sought. The jury also found that OACC had breached its implied covenant of good faith and fair dealing in negotiating its long-term contract with the Raiders, but that the Raiders had suffered no damage as a result. The trial court denied the Raiders' posttrial motion for attorney fees. Both sides appeal from the ensuing judgment and the Raiders appeal from the order denying them attorney fees.

For the reasons that follow, we shall conclude that OACC's motion for judgment notwithstanding the verdict (JNOV) on the fraud count was meritorious and should have been granted.

In an unpublished portion of this opinion, we also find without merit the Raiders' assignments of evidentiary and instructional error on cross-appeal. We shall reverse with directions, while dismissing as moot the Raiders' appeal from the order denying attorney fees.

## FACTUAL BACKGROUND

OACC is a nonprofit public benefit corporation that was formed in 1961 for the purpose of helping to finance and construct a multipurpose public recreation coliseum and stadium (Coliseum) in the City of Oakland. The Raiders are a professional football team which, in 1960, began its existence in Oakland as a member of the American Football League (AFL). When the

Coliseum was built, the Raiders moved in as its first tenant. In 1970, the Raiders joined the National Football League (NFL) when the AFL merged with the NFL. The Raiders won Super Bowls following the 1976 and 1980 seasons, and enjoyed fine attendance during that period.

Until 1980, the Raiders played at the Coliseum under a series of five-year leases. In 1982, the team relocated to Los Angeles. However, as the expiration of their stadium lease in Los Angeles drew near, the Raiders entered into negotiations with the City of Oakland (City), County of Alameda (County) and OACC to bring the team back to Oakland.

These negotiations culminated in two letter agreements, both dated June 23, 1995. The first agreement set forth material terms for completion of documents to implement a long-term contract that would commit the Raiders to play in the Coliseum for 1995 and for 15 subsequent football seasons. A confidential side agreement described the first agreement as a "letter of intent," described the parties' rights and obligations for the upcoming 1995 season, and set forth certain contingencies that would allow the Raiders to terminate the contemplated transaction.[1]

OACC then launched a marketing campaign to sell personal seat licenses (PSL's) as well as club and luxury suites to the fans. By purchasing a PSL, a fan acquired the right (and assumed the obligation) to buy season tickets in designated seats for the Raiders' games for the 1995 season and for the next 10 seasons. Because of strong demand, the accounting firm of Arthur Andersen LLP was retained to conduct a lottery for PSL seating assignments. To be included in the lottery, a fan had to submit a PSL application and a 25 percent deposit by July 17, 1995. To complete the purchase, if accepted, the applicant had to put down an additional 25 percent within 15 days of the invoice date, and pay the remaining 50 percent by March 15, 1996.

On July 20, 1995, OACC issued a press release, forwarded to the Raiders, entitled "1995 Games Sell Out in First Phase of [the] Raider[s'] Ticket Drive." The release declared that PSL's were "grabbed off rapidly" in the first round of marketing which closed on July 17, and that 46,980 seats were sold, including 44,700 PSL's and 2,280 seats to suite holders. It continued: "Along

---

[1] In summary judgment proceedings, OACC argued that the two June 23, 1995 letters constituted a *binding contract* obligating the Raiders to play in the Coliseum for 16 football seasons. However, the law and motion judge ruled that the letters only bound the Raiders to play the 1995 season in Oakland, while committing both parties to negotiate in good faith a long-term contract for future years. The trial judge considered himself bound by that ruling and instructed the jury accordingly.

with seats already committed to the NFL and the Raiders, this represents a sellout for 1995 and 80% of the seats for an expanded Stadium in 1996." The press release quoted marketing director Ted Ganis as saying luxury boxes were completely sold out for 1995 and applicants were being asked to share boxes for that season. Said Ganis: "The response is so strong and the enthusiasm so real that, not only did we sell out for 1995, we expect to be fully sold out for the 1996 season by Thanksgiving."

There was evidence that OACC repeated the substance of these representations to the Raiders between July 20 and August 7, 1995.

In fact, while some 45,000 PSL applications had been received, Arthur Andersen LLP excluded about 10 percent of them from the lottery due to credit card problems. Additional applicants were disqualified after the lottery due to bounced checks and other reasons, such that 37,000 PSL seats finally ended up being assigned.

On August 7, 1995, the Raiders executed a binding contract with OACC, the City, County and other entities (collectively the East Bay Entities), committing the Raiders to play in Oakland for 16 consecutive football seasons. The contract consisted of a "Master Agreement" and a series of incorporated collateral agreements (collectively the August 7 agreements), governing such matters as stadium operation, loans for improvements, marketing and revenue sharing.

The Raiders presented testimony to the effect that they were not informed of the true state of PSL and luxury seat sales prior to executing the August 7 agreements. The Raiders' team is controlled by its general partner, A. D. Football, Inc., a California corporation, and its president, Al Davis, who signed all of the agreements on behalf of the Raiders. Davis testified that he relied on the "sellout" representations in entering into the August 7 agreements and that, had he known the representations were false, he would have pursued overtures from representatives of the City of Baltimore, who were trying to persuade the team to move there.

The Raiders learned the true facts concerning the status of ticket sales during the 1995 football season.

On June 1, 1996, the Raiders executed a new agreement with the East Bay Entities, which incorporated and supplemented the August 7 agreements

(June 1996 Supplement or Supplement). The Supplement reaffirmed and clarified certain provisions of the August 7 agreements; it also modified these agreements with respect to disposition of deposits on suite licenses, timetable for construction of additional suites, selection and use of loan proceeds for an alternate training facility, sharing of advertising revenue, interest rate payable on long-term loans made to the Raiders, and terms for prepayment of the loan and credit against the Raiders' loan balance upon acquisition of title to stadium improvements by the East Bay Entities.

The Supplement concluded that "[e]xcept as otherwise specifically supplemented, interpreted or modified by this Supplement, *all terms and provisions of the [August 7] [a]greements shall remain unmodified and in full force and effect. This Supplement* and the other agreements and schedules referred to herein, shall constitute the *entire agreement among the parties relating to the subject matter* hereof and . . . *shall supersede any negotiations, understandings, or agreements, written or oral relating to the subject matter* hereof and *thereof*, and shall not be changed or terminated orally." (Italics added.)

Although all PSL and luxury suites had not been sold at the time the August 7 agreements were executed, the Raiders ultimately sold out the Coliseum in the 1995 football season, and they made no claim of financial loss for that year. However, the Raiders' performance faltered at the end of 1995 and they fell below .500 in winning percentage in 1996. While gross ticket sales in 1996 remained about the same as the previous year, the Raiders did not sell out, due to expansion of the stadium. Attendance slipped further in 1997, when the Raiders won four and lost 12 games. Thus, the Raiders failed to sell out in either 1996 or 1997.

The Raiders' theory of damages was that a sellout of PSL's and luxury suites in 1995 would have created an "excess demand" for tickets that would have resulted in season sellouts for the next 15 years. The Raiders' witnesses also testified that by contracting with OACC the team lost the opportunity to move to Baltimore, where the team would have realized greater profits and enhanced franchise value.

## PROCEDURAL HISTORY

This litigation commenced in September 1997, when the East Bay Entities brought an action against the Raiders seeking, inter alia, a declaratory

judgment that the team had no right to rescind the August 7 agreements and Supplement or move the team from Oakland. In June 1998, after OACC was brought in as a party plaintiff, the complaint was amended to allege that the Raiders' management was claiming the team had the right to terminate or rescind the August 7 agreements and Supplement on grounds of fraudulent inducement, but that the claim was "completely untrue," and in any event was barred by the doctrines of waiver, estoppel, laches, release and unclean hands.

The Raiders countered with a cross-complaint setting forth causes of action for rescission, breach of contract, declaratory relief, and intentional and negligent misrepresentation.

In pretrial proceedings, the law and motion judge ruled that the Raiders could not rescind the August 7 agreements and Supplement, thereby granting the East Bay Entities' motion for summary judgment on the declaratory relief cause of action. In the same order, the judge granted the Raiders leave to amend their cross-complaint to state a cause of action for breach of the implied covenant of good faith and fair dealing with respect to the June 23 letter agreements, based upon misrepresentations of material fact as to the status of ticket sales. The Raiders amended their cross-complaint accordingly.

The court subsequently dismissed the Raiders' tort claims (including misrepresentation) against all of the East Bay Entities except OACC for failure to comply with the claims presentation requirements of the California Tort Claims Act (Gov. Code, § 810 et seq.). However, the court refused to dismiss OACC, finding that there were triable issues of fact as to whether OACC was a public agency to which the Tort Claims Act applies.

Eventually OACC was judicially deemed to be a private entity for purposes of this lawsuit *as a discovery sanction* for willful failure to comply with orders to produce documents and for evasive and incomplete answers to interrogatories pertaining to OACC's status as a public or private entity.[2]

The case submitted to the jury was pared down to the Raiders' claims for intentional misrepresentation, negligent misrepresentation and breach of the implied covenant of good faith and fair dealing.

---

[2] OACC argues on this appeal that the trial court erred in refusing to summarily adjudicate its status as a public entity prior to imposing the discovery sanction. Our disposition dispenses with the need to reach the merits of this claim.

By special verdict the jury found (1) that OACC had not committed the tort of intentional misrepresentation; (2) that OACC was liable to the Raiders for negligent misrepresentation in the sum of $34,203,135;[3] and (3) that OACC breached the implied covenant of good faith and fair dealing, but the Raiders suffered no damage on account of the breach.

## DISCUSSION

OACC contends that the evidence established conclusively that the Raiders had waived their claim of fraudulent inducement with respect to the August 7 agreements by entering into the June 1996 Supplement. OACC made the same argument to the trial court before the case went to the jury and by way of motion for JNOV. Each time, the court rejected OACC's position. We conclude that JNOV was compelled under the facts of this case.

## I.   Negligent Misrepresentation—a Type of Deceit

The jury, by its verdict, found that the Raiders were induced by OACC's negligent misrepresentations to enter into the August 7 agreements, which bound them to play in Oakland for 15 subsequent football seasons.

██  While intentional fraud requires the intent to deceive (Civ. Code, § 1709), negligent misrepresentation encompasses "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true" (Civ. Code, § 1710, subd. 2), or "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true" (Civ. Code, § 1572, subd. 2).

Hence, "the term 'fraud' may be used to describe not just an intentional misrepresentation but as well certain misrepresentations that are merely negligent, as the separate and distinct tort of negligent misrepresentation is 'a species of the tort of deceit.' " (*Kolodge v. Boyd* (2001) 88 Cal.App.4th 349, 371–372 [105 Cal.Rptr.2d 749], quoting *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407 [11 Cal.Rptr.2d 51, 834 P.2d 745].)

---

[3] Two OACC codefendants, Edwin O. DeSilva (its director) and Arthur Andersen LLP (its accountant), stood trial along with OACC on the misrepresentation claims. Both were exonerated by the jury's verdict in August 2003 and the Raiders abandoned their claims against DeSilva and Arthur Andersen LLP in this appeal in March 2004.

## II.   The Implied Waiver Rule

■   California law has, for more than a century, recognized that a plaintiff claiming to have been induced into signing a contract by fraud or deceit is *deemed to have waived* a claim of damages arising therefrom if, after discovery of the alleged fraud, he enters into a new contract with the defendant regarding the same subject matter that supersedes the former agreement and confers upon him significant benefits. (*Burne v. Lee* (1909) 156 Cal. 221, 226 [104 P. 438] (*Burne*); *Schmidt v. Mesmer* (1897) 116 Cal. 267, 270–272 [48 P. 54] (*Schmidt*); *Smith v. Roach* (1975) 53 Cal.App.3d 893, 898 [126 Cal.Rptr. 29] (*Smith*); *Ball v. Warner* (1926) 80 Cal.App. 427, 431 [251 P. 929].)

*Schmidt* is the seminal California Supreme Court case on the subject and bears substantial similarity in fact pattern to ours. In *Schmidt*, the defendant leased a hotel to the plaintiffs for a three-year term. The plaintiffs alleged that the defendant fraudulently misrepresented the amount of monthly income the hotel had generated. There was a conflict in the evidence as to whether the defendant made the misrepresentation and whether, prior to signing the contract, the plaintiffs were given access to records that accurately reflected the income of the hotel. (*Schmidt, supra,* 116 Cal. at p. 268.)

The plaintiffs discovered the true facts almost immediately after taking possession of the hotel. Several months later, they fell behind on the rent. Without mentioning the fraud, they proceeded to negotiate an agreement with the defendant permitting them to execute a promissory note in lieu of rental payments, due in six months. (*Schmidt, supra,* 116 Cal. at pp. 269–270.)

The California Supreme Court found it unnecessary to reach any of the claims of evidentiary and instructional error, because the evidence showed conclusively that the plaintiffs, by their conduct, had waived their claim of fraudulent inducement. (*Schmidt, supra,* 116 Cal. at p. 270.) Declared the court: "It is no doubt the law, that while where a party seeks to rescind a contract into which he was induced to go by the fraudulent representations of another party, he must rescind at once upon the discovery of the fraud, and restore the other party, as near as may be, to his former condition, yet he may elect to go on with the contract, and sue to recover damages for the deceit, without giving any warning to the other party that he intends at some future time to charge him with fraud. . . . But this rule, which relieves a party when he chooses to sue for damages from many of the acts required of him when he elects to rescind, is subject to some just limitations. If, after his knowledge of what he claims to have been the fraud, he elects not to rescind, but to adopt the contract and sue for damages, he must stand toward the other party at arm's length; he must on his part comply with the terms of the contract; *he*

*must not ask favors of the other party, or offer to perform the contract on conditions which he has no right to exact, and must not make any new agreement or engagement respecting it; otherwise he waives the alleged fraud."* (*Id.* at pp. 270–271, italics added.) Concluding that the plaintiffs' conduct "clearly brings them within the principle declared in the authorities above cited," the court held that the fraud claim was waived. (*Id.* at p. 272.)

Fifty years later, the state's high court modified the rule articulated in *Schmidt,* but only slightly. In *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744 [192 P.2d 935] (*Bagdasarian*), the buyers had purchased a farm from the seller. In response to a foreclosure suit, the buyers filed a cross-complaint alleging they had been induced to purchase the farm through fraud, a claim that prevailed at trial. (*Id.* at p. 747.) On appeal, the seller argued that the buyers' mere *request* for an extension of time to make payments on their note constituted an estoppel or waiver of their fraud claim. The court disagreed stating, "There appears to be no decision in California or elsewhere which squarely holds on its facts that the mere making of an unfulfilled request alone constitutes a waiver as a matter of law. . . . [¶] We think it unjust and unreasonable to hold as a matter of law that the mere asking of a favor should deprive an innocent person of rights arising from an unquestionably fraudulent act, and we therefore disapprove of the language in *Schmidt* . . . to the extent that it indicates that the making of a request that is not complied with in itself constitutes a waiver without regard to the circumstances under which it is made." (*Id.* at p. 751, citation omitted.)

The core holding of *Schmidt/Bagdasarian* is that one who, after discovery of an alleged fraud, ratifies the original contract by entering into a new agreement granting him substantial benefits with respect to the same subject matter, is deemed to have waived his right to claim damages for fraudulent inducement. While it has not recently been the central focus of judicial scrutiny in this state, the rule still stands as binding precedent.[4]

The rule is universally recognized and is illustrated in cases from numerous other jurisdictions. (See *Glenn Dick Equipment Co. v. Galey Construction, Inc.* (1975) 97 Idaho 216, 224 [541 P.2d 1184, 1192], quoting 37 Am.Jur.2d

---

[4] In *Smith, supra,* 53 Cal.App.3d 893, a 1975 case, the trial court granted nonsuit based on *Schmidt* when counsel disclosed in his opening statement that, after learning that the seller had made misrepresentations concerning an apartment building, the plaintiffs entered into a contract to sell the property to a third party. The Court of Appeal reversed on the ground that the *Schmidt* rule is only applicable where the defrauded plaintiff enters into a new agreement with the same party who allegedly procured the fraud. (*Smith,* at pp. 898–899.)

*Alhino v. Starr* (1980) 112 Cal.App.3d 158, 168 [169 Cal.Rptr. 136], is to like effect, with the defendant realtors unsuccessfully asserting that the buyers had waived their fraud claim against them by entering into a settlement with the sellers.

(1968) Fraud and Deceit, § 397, p. 542 [" 'if one induced by misrepresenta-tions or fraud . . . to enter into a contract for the . . . use of[] property thereafter, with knowledge of the deception, receives from the party guilty of fraud some substantial concession or enters into a new contract in respect of the transaction, he thereby relinquishes all right to recover or recoup damages because of the misrepresentations' "]; *Dorr v. Janssen* (1963) 233 Ore. 505, 510–511 [378 P.2d 999, 1001]; see also *Kern-Limerick, Inc. v. Mikles* (1950) 217 Ark. 492, 496–497 [230 S.W.2d 939, 941–943] [request and agreement to extend time for payment waived fraud claim as a matter of law]; *Harpold v. Stock* (Fla. 1953) 65 So.2d 477, 478 [purchaser of stock who negotiated a new contract with seller and received additional concessions waived claim of fraudulent inducement]; *Oleet v. Pennsylvania Exchange Bank* (1955) 285 A.D. 411, 413–415 [137 N.Y.S.2d 779, 781–783] [borrowers who claimed bank fraudulently induced them to sign promissory notes negotiated subsequent agreement changing the timing and terms of payment; complaint dismissed at the pleading stage]; *Marks v. Stein* (1916) 1916 OK 924 [61 Okla. 59, 60, 160 P. 318, 319] [buyer, after discovery of allegedly defective goods, paid part of purchase price and signed a note for the balance; reversed with directions to enter judgment for seller]; *Linda Coal & Supply Co. v. Tasa Coal Co.* (1964) 416 Pa. 97, 100–101 [204 A.2d 451, 453–454] [tenant who, after discovery of alleged fraud, reaches a new agreement with landlord granting him more favorable terms waives claim for damages]; *Timmerman v. Gurnsey* (1928) 206 Iowa 35, 37–38 [217 N.W. 879, 880] [same].)

The trial court determined that the implied waiver issue was a question of fact for the jury. The court also accepted the Raiders' argument that OACC had to prove by "clear and convincing evidence" that the Raiders *intended* to waive their right to sue for fraud when they entered into the June 1996 Supplement, and instructed the jury accordingly. Emphasizing OACC's lofty burden and citing the Raiders' witnesses' denials that they "intended" to waive their fraud claim, counsel for the Raiders urged the jurors to reject the waiver defense. Not surprisingly, they did.[5]

At the outset, we note that the trial court's decision to submit the implied waiver question to the jury was influenced by, if not based on, a serious misreading of *Schmidt, supra,* 116 Cal. 267. In its written ruling, the court asserted that in *Schmidt,* "*the jury* had found that the *plaintiffs waived any fraud* in the inducement . . . by requesting a reduction in rent . . . and by requesting and obtaining an extension of time to pay the rent, all without any reference to the alleged fraud." (Italics added.) The court went on to state that "the plaintiffs' intent to waive was not deemed as a matter of law, but was

---

[5] In special verdict No. 5, the jury answered "No" to the following question: "Have the Defendants proved by clear and convincing evidence that the Raiders intended to and did waive their fraud claim . . . when the Raiders entered into the June 1, 1996 Supplement?"

instead found as a matter of fact by the jury and affirmed by the Supreme Court having found no evidence in the record to support a contrary verdict." This is a profoundly inaccurate statement of the facts and holding of *Schmidt*.

In *Schmidt*, the plaintiffs sued for fraud in the inducement. The evidence was in conflict as to whether the plaintiffs were defrauded and the jury returned a verdict for the defendants. (*Schmidt, supra,* 116 Cal. at pp. 267–269.) The plaintiffs appealed, alleging errors in the jury instructions and in certain evidentiary rulings made by the trial court. Our Supreme Court swept all of these arguments aside, however, on the ground that "the acts of the [plaintiffs], as hereinafter stated, constituted a waiver of the alleged fraud, . . . and *prevent [them] from recovering in this action, without regard to said alleged errors.*" (*Id.* at p. 269, italics added.)

Thus, contrary to the trial court's belief, the *Schmidt* jury made no factual finding of waiver—the *Supreme Court found waiver* as a matter of law from the plaintiffs' conduct. The court makes this abundantly clear in the concluding sentence of the opinion: "This conduct of the [plaintiffs] clearly brings them within the principle declared in the authorities above cited, and, this being so, *the alleged errors of the court, with respect to other matters, become immaterial. Under no view of the case could a verdict in favor of plaintiffs be maintained.*" (*Schmidt, supra,* 116 Cal. at pp. 272–273, italics added.)

In *Bagdasarian*, the Supreme Court did not overrule *Schmidt*, but merely disapproved of dicta indicating that an ungranted request for a favor automatically brings down the curtain on the plaintiff's case. (*Bagdasarian, supra,* 31 Cal.2d at p. 751.) Here, we have much more than an ungranted request. We have a new agreement negotiated and signed by the parties, which not only bestows substantial benefits on plaintiff (the Raiders), but also *reaffirms the former agreement* that plaintiff (the Raiders), after receiving such benefits, now claims was procured by fraud.[6]

The *Bagdasarian* court strongly indicated that the *Schmidt* rule still applies under such circumstances: "There is serious doubt whether even a granted request of a favor, such as an extension of time, should be held to constitute a waiver *in the absence of estoppel* or the making of a new agreement supported by consideration, but we need not determine that question here because the facts established by the record are not as claimed by appellant." (*Bagdasarian, supra,* 31 Cal.2d at pp. 751–752, italics added.)

---

[6] The June 1996 Supplement recites: "Except as otherwise specifically supplemented, interpreted or modified by this Supplement, *all terms and provisions of the [August 7] [a]greements shall remain unmodified and in full force and effect.*" (Italics added.)

As the italicized language indicates, the implied waiver consequence recognized in *Schmidt* and *Bagdasarian* is better understood as an application of the doctrine of equitable estoppel than "waiver" in the traditional sense, which generally rests on a party's intent.

■ "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment." (*Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264], citing *City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 488–489 [91 Cal.Rptr. 23, 476 P.2d 423] (*Mansell*).) The traditional elements of estoppel are: " '(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury.' " (*Mansell, supra,* 3 Cal.3d at p. 489.)

The estoppel underpinnings of the implied waiver rule may be traced back to *Schmidt* itself, where our Supreme Court observed: "It is true that one actually guilty of fraud is not entitled to much consideration; but the real difficulty usually is to determine whether or not the alleged fraud actually existed, and the issue has generally to be determined upon conflicting testimony, and in accordance with the preponderance of evidence. *In such a case it is evident that the party who keeps his intended charge of fraud secret for years has a great advantage in preparing for a future intended action, which he alone anticipates, over his adversary, who has had no intimation of such action or such charge of fraud, and has had no reason to preserve or discover evidence concerning it.*" (*Schmidt, supra,* 116 Cal. at p. 270, italics added.) Noting the injustice of permitting a party to gain new benefits "without giving any warning to the other party that he intends at some future time to charge him with fraud," the court fashioned the rule that a party aware of the alleged fraud must stand at arm's length from his adversary and not enter into a new agreement extracting concessions, lest he be deemed to have waived his claim of fraud. (*Ibid.*)

■ While the question of waiver ordinarily turns on the intent of the party against whom it is asserted, estoppel focuses solely on the party's *conduct*: "The term 'waiver' is sometimes used indiscriminately to refer to the doctrine of waiver, and the distinct but similar doctrine of estoppel. [Citation.] 'Waiver refers to the act, or the consequences of the act, of one side. Waiver is the intentional relinquishment of a known right after full knowledge of the facts and depends upon the intention of one party only. Waiver does not require any act or conduct by the other party.' [Citation.]

Thus, '[t]he *pivotal* issue in a claim of waiver is the intention of the party who allegedly relinquished the known legal right.' [Citation.] ' "[E]stoppel is applicable where the conduct of one side has induced the other to take such a position that it would be injured if the first should be permitted to repudiate its acts." ' " (*Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 678 [95 Cal.Rptr.2d 583] (*Old Republic Ins.*), citing and quoting *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54, 59 [35 Cal.Rptr.2d 515].)

This form of estoppel is, for practical purposes, indistinguishable from the doctrine of implied waiver through conduct. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *id.*, at pp. 33–34 [" 'California courts will find waiver when a party intentionally relinquishes a right *or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished,*' " italics added].) As one national treatise states, "a person defrauded in a transaction may, by *conduct inconsistent with an intention to sue for damages* for the fraud, waive the right to sue. Waiver in this sense may mean not only a consensual waiver, but a relinquishment of rights and powers akin to estoppel." (37 Am.Jur.2d (2001) Fraud and Deceit, § 321, p. 332.)

### III.   OACC May Raise the Estoppel Defense[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### IV.   Application of the *Schmidt/Bagdasarian* Rule

In this case, the Raiders admittedly discovered the falsity of the OACC's "sellout" representations regarding PSL and other ticket sales not later than the end of the 1995 football season.[7] In 1996, without any mention of fraud, they negotiated and executed a new agreement concerning the same subject matter, which modified the rights of the parties, granted the Raiders significant benefits,[8] and otherwise reaffirmed the validity and enforceability

---

[*]See footnote, *ante*, page 1175.

[7] The jury was instructed: "It has been determined from the pleadings in this case that, as a matter of law, the [Raiders] were aware of the alleged fraud during the 1995 football season. Therefore, for purposes of your deliberations, it is conclusively established that the [Raiders] became aware during the 1995 football season of the alleged misrepresentations upon which they based their claims of fraud."

[8] The June 1996 Supplement, whose recited purpose was to "clarify and implement certain provisions of and confirm certain further decisions and elections pursuant to that certain Master Agreement . . . executed on August 7, 1995," modified the August 7 agreements in a number of significant respects. Among other things, the Supplement benefited the Raiders in that it:

of the August 7 agreements. Under the principles set forth in *Schmidt* and *Bagdasarian*, these facts establish an implied waiver of the Raiders' claim for fraudulent inducement.

We acknowledge the existence of cases that stand for the truism that the existence of waiver is ordinarily a question of fact. (E.g., *French v. Freeman* (1923) 191 Cal. 579, 590 [217 P. 515]; *Craig v. White* (1921) 187 Cal. 489, 498 [202 P. 648]; *Wilder v. Beede* (1898) 119 Cal. 646, 650–651 [51 P. 1083]; *California Southern Hotel Co. v. Callender* (1892) 94 Cal. 120, 126 [29 P. 859]; *Russel v. Amador* (1853) 3 Cal. 400, 402–403.) But this does not mean it can never be a question of law, as *Schmidt* itself plainly demonstrates. Implied waiver, especially where it is based on conduct manifestly inconsistent with the intention to enforce a known right, may be determined as a matter of law where the underlying facts are undisputed (*Old Republic Ins.*, *supra*, 80 Cal.App.4th at p. 679), or the evidence is susceptible of only one reasonable conclusion (see, e.g., *Guess?, Inc. v. Superior Court* (2000) 79 Cal.App.4th 553, 557–559 [94 Cal.Rptr.2d 201] [implied waiver of right to compel arbitration]; *Pine v. Tiedt* (1965) 232 Cal.App.2d 733, 737–738 [43 Cal.Rptr. 184] [implied waiver of right to partition land].)

The facts surrounding the execution of the June 1996 Supplement satisfied all the elements of implied waiver, while the only evidence to the contrary— the Raiders' undisclosed *subjective* intent to preserve their fraud claim—was entitled to no weight whatsoever.

Cases cited by the Raiders to support their claim that the implied waiver issue was a factual one are clearly distinguishable. For example, in *Clark Equipment Co. v. Wheat* (1979) 92 Cal.App.3d 503 [154 Cal.Rptr. 874], the defendant compounded the original fraud by making a second misrepresentation. There, the seller, Clark Equipment, sold the plaintiff Wheat a "reconditioned" forklift called the York TM 70, which proved defective. When Wheat complained that the TM 70 did not perform as promised, Clark Equipment induced Wheat to buy a more expensive forklift, the CHY 140, promising Wheat that such a purchase would relieve Wheat of its obligation to make further payments on the TM 70. (*Id.* at pp. 512–514, 519.) Subsequently, Clark Equipment filed a lawsuit against Wheat for default in payments on the TM 70 and Wheat cross-complained for fraud, breach of warranty and breach of contract. In upholding a jury verdict in favor of Wheat, the court found

---

(1) entitled them to all deposits paid on long-term suite licenses after two seasons; (2) allowed them to use a $10 million loan to acquire property for and construct an alternate training site of their own choosing, in lieu of the training site on publicly owned land, as designated in the August 7 agreements; (3) gave them an increased share of nonclub advertising revenues; and (4) substantially reduced their interest rate on $53.9 million worth of long-term loans.

"no indication of any express or implied relinquishment of Wheat's right to damages for [Clark] Equipment's misrepresentations" with respect to the TM 70. (*Id.* at p. 530.)

■ *Lawson v. Town & Country Shops, Inc.* (1958) 159 Cal.App.2d 196, 201 [323 P.2d 843], *Friedberg v. Weissbuch* (1955) 135 Cal.App.2d 750, 756 [287 P.2d 785], and *Lobdell v. Miller* (1952) 114 Cal.App.2d 328, 338 [250 P.2d 357], all apply the *Bagdasarian* dictum that the mere granting of a favor will not constitute waiver as a matter of law, but in none of the cases did the plaintiff enter into a new contract with the defendant that not only conferred new benefits on the plaintiff but ratified the very agreement purportedly induced by fraud. As the court in *Smith* stated, a plaintiff claiming fraud in the inducement is deemed to have waived his claim of damages "if, after he discovers the fraud, he makes a '*new agreement or engagement*' with the other party to the original contract (the contract allegedly procured by the fraud of that party), and such new agreement or engagement *results in a compromise and adjustment of the plaintiff's rights under the original contract, thereby superseding that contract.*" (*Smith, supra,* 53 Cal.App.3d at pp. 898–899, quoting *Burne, supra,* 156 Cal. at p. 226, italics modified from original; see also *Burne,* at pp. 226–228.)[9]

■ The Raiders' conduct in obtaining additional benefits *and* ratifying the earlier contract sets this case apart from all those relied on by the trial court and the Raiders. In the words of *Schmidt*: " 'We fully recognize and approve the rule that a party may retain what he receives, stand to his bargain, and recover for the loss caused him by the fraud. [But] where a party, with full knowledge of all the material facts, does an act which indicates his intention to stand to the contract, and waive all right of action for fraud, he cannot maintain an action for the original wrong practiced upon him. *Where the affirmance of the contract is equivalent to a ratification, all right of action is gone.* . . . [Thus] where a party, with full knowledge,

---

[9] *Schied v. Bodinson Mfg. Co.* (1947) 79 Cal.App.2d 134 [179 P.2d 380] (*Schied*), which is cited by both parties, is unusual in that its dicta swims against the current of its holding. There, a purchaser of a dredging machine claimed that it was defective and that the manufacturer was guilty of fraud in the inducement. (*Id.* at pp. 136–137.) The trial court found that after discovering the defects, the buyer negotiated a new agreement with the manufacturer that reaffirmed the old one and granted him significant concessions. The trial court, applying the *Schmidt* rule, concluded that the buyer had waived his fraud claim, *and the appellate court affirmed,* declaring that the rule fit "perfectly" into the facts of the case. (*Id.* at pp. 138–139, 142–143, 145.)

Although the *Schied* court could have stopped there, the opinion then meanders into case law indicating that waiver presents a question of fact. (*Schied, supra,* 79 Cal.App.2d at pp. 143–144.) While *Schied* concludes that "[w]e may *not hold,* as a matter of law . . . , that the appellant *did not intend* to waive the fraud" (*id.* at p. 144, italics added), we submit the court could, with better clarity, have said that the facts found by the trial court established implied waiver as a matter of law.

declines to repudiate a transaction known to him to be fraudulent, and fully and expressly ratifies it, he can neither rescind nor maintain an action for damages.' " (*Schmidt, supra,* 116 Cal. at pp. 271–272, quoting *St. John v. Hendrickson* (1882) 81 Ind. 350, 353–354; *Bonded Adjustment Co. v. Anderson* (1936) 186 Wn. 226, 231 [57 P.2d 1046, 1048] ["when a party claiming to have been defrauded enters, after discovery of the fraud, into new arrangements or engagements concerning the subject matter of the contract to which the fraud applies, he is deemed to have waived any claim for damages on account of the fraud"]; Prosser & Keeton, Torts (5th ed. 1984) § 110, p. 770 [defrauded party who, after discovery, enters into contract granting favors or concessions, "will be held to have surrendered his claim in return for what is in effect *a new agreement,* replacing the old one," italics added].)

The Raiders try to avoid these consequences by citing evidence that *both* parties benefited by the June 1996 Supplement, even suggesting that OACC may have benefited more. However, the rule contains no requirement that the party against whom it applies receive greater consideration than his adversary, or that the fact finder weigh and compare the benefits received by each party. The undisputed evidence that the Raiders obtained significant monetary and nonmonetary concessions by virtue of the new contract (see fn. 8, *ante*) is sufficient. In this case, the Supplement's reduction of the Raiders' interest rate on two long-term loans *by itself* saved the team $109 million in interest payments, or more than three times the amount of the compensatory damages the jury awarded in this case.

■ Finally, application of the *Schmidt/Bagdasarian* rule to the facts of this case vindicates the estoppel principles upon which it rests: By signing the June 1996 Supplement, the Raiders reaffirmed the validity of the original contract and induced OACC to change its position, to OACC's detriment. " ' "The vital principle is that he who by his language or conduct leads another to do what he would not otherwise have done shall not subject such person to loss or injury by disappointing the expectations upon which he acted. Such a change of position is sternly forbidden. It involves fraud and falsehood, and the law abhors both." ' " (*Mansell, supra,* 3 Cal.3d at p. 488, quoting *Seymour v. Oelrichs* (1909) 156 Cal. 782, 795 [106 P. 88].) OACC should not have to defend itself against a multimillion dollar fraud claim of which the Raiders were aware but concealed at the time they entered into a new agreement granting the Raiders significant concessions.

Our dissenting colleague declines to accept the rule we apply on the view that a fraud plaintiff should be able to negotiate an agreement for "half a loaf" while keeping the fraud charge a secret, and then be able to sue for the entire "loaf" in a subsequent lawsuit. (Dis. opn., *post,* at pp. 1199–1200.) But it is precisely this sort of conduct that is condemned as impermissible by

*Schmidt* and the numerous authorities from around the nation that we have cited. Thus, it is the dissent, not our decision, which advocates for a significant change in the law.

■ We also disagree with the dissent's assertion that we have "substitut[ed]" estoppel for implied waiver, thereby "denigrat[ing]" the importance of intent. (Dis. opn., *post*, at p. 1199.) Whether denominated "estoppel" or "implied waiver as a matter of law," the operative principle is exactly the same—where a party's conduct is so inconsistent with the intent to enforce a legal right, the intention to give up that right will be *presumed*, notwithstanding evidence that the party did not subjectively "intend" to relinquish it. (Dis. opn., *post*, at p. 1199.)

### V. Denial of JNOV Was Error

An appellate court reviews the grant or denial of a motion for JNOV de novo using the same standard as the trial court. (*Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 829–830 [11 Cal.Rptr.3d 914].) A JNOV must be granted where, viewing the evidence in the light most favorable to the party securing the verdict, the evidence compels a verdict for the moving party as a matter of law. (*Paykar Construction, Inc. v. Spilat Construction Corp.* (2001) 92 Cal.App.4th 488, 493–494 [111 Cal.Rptr.2d 863]; see, e.g., *Sukoff v. Lemkin* (1988) 202 Cal.App.3d 740, 743 [249 Cal.Rptr. 42]; *DeVault v. Logan* (1963) 223 Cal.App.2d 802, 810 [36 Cal.Rptr. 145].) In general, " '[t]he purpose of a motion for judgment notwithstanding the verdict is not to afford a review of the jury's deliberation but to prevent a miscarriage of justice in those cases where the verdict rendered is without foundation.' " (*Sukoff v. Lemkin, supra,* 202 Cal.App.3d at p. 743.)

■ We conclude that the Raiders' conduct was " ' "so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished" ' " (*Old Republic Ins., supra,* 80 Cal.App.4th at p. 678), and there was no substantial competent evidence to support a contrary conclusion. Since implied waiver of the fraud claim was established as a matter of law, the trial court erred in denying OACC's motion for JNOV.

Our conclusion renders it unnecessary for us to reach any of the other assignments of error raised by OACC. It also moots the Raiders' claim on cross-appeal that the trial court erroneously refused to award them attorney fees as the prevailing party. Our remaining task is to address the Raiders' contentions that the trial court committed evidentiary and instructional errors, such that they are entitled to a new trial on damages for breach of the implied covenant of good faith and fair dealing.

## VI.   Cross-appeal[*]

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

## DISPOSITION

The order denying OACC's motion for JNOV on the fraud cause of action is reversed with directions to grant the motion. The trial court is directed to vacate the judgment and prepare a new judgment consistent with this disposition. The Raiders' appeal from the order denying attorney fees is dismissed as moot. OACC shall recover its costs on appeal (Cal. Rules of Court, rule 27(a).)

Raye, J., concurred.

**DAVIS, Acting P. J.,** Dissenting.—I respectfully dissent. Unlike the majority, I believe the trial court properly denied the motions of the Oakland-Alameda County Coliseum (OACC) for judgment notwithstanding the verdict (JNOV) on the negligent misrepresentation (fraud) count. The trial court properly submitted to the jury, as a question of fact, the issue of whether the Oakland Raiders (Raiders) had waived its claim of fraud, and correctly instructed on this issue as one of intentional relinquishment. And there is substantial evidence to support the jury's finding that the Raiders did not waive this claim.

More generally, I believe that the majority's approach to the doctrine of implied waiver—by basing that doctrine on estoppel while downplaying intent—is misguided. That approach muddles the law in this area. And that muddle will now make it easier to find that a party has waived a fraud claim as a matter of law, thereby harming many who may actually have been defrauded. The majority concludes that the doctrine of implied waiver as to a fraud claim is *"better* understood as an application of the doctrine of equitable estoppel than 'waiver' in the traditional sense, which generally rests on a party's intent." (Maj. opn., *ante,* at p. 1189, italics added.) On the contrary, the doctrine of implied waiver as to a fraud claim is *best* understood as an application of the doctrine of implied waiver, which focuses on intent.

I must begin at the beginning. " ' "[W]aiver is the intentional relinquishment of a known right after knowledge of the facts." ' " (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).) " ' " 'Waiver always rests upon intent.' " ' " (*Ibid.*) "[A] waiver may be either express, based on the words of the waiving party, *or implied, based on conduct indicating an intent* to relinquish the right." (*Ibid.,* italics

---

[*]See footnote, *ante,* page 1175.

added.) Thus, " 'California courts will find waiver when a party [expressly] relinquishes a right or when that party's acts [i.e., conduct] are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.' " (*Id.* at pp. 33–34.) Whether a party waives a right by expression or by conduct, that party must always intend to waive the right because waiver, express or implied, always rests upon intent. Intent may be implied through conduct. (*Id.* at p. 31.)

These waiver rules, beginning with *Schmidt v. Mesmer* (1897) 116 Cal. 267 [48 P. 54] (*Schmidt*), have been applied in the context of a contractual party who may have been fraudulently induced to enter into a contract but who, through subsequent expression or conduct, has been found to have waived any claim of fraud through intentional relinquishment. Citing *Schmidt*, as well as the other venerable decisions cited in the majority opinion—*Burne v. Lee* (1909) 156 Cal. 221 [104 P. 438] and *Ball v. Warner* (1926) 80 Cal.App. 427 [251 P. 929]—this court, nearly 60 years ago, in *Schied v. Bodinson Mfg. Co.* (1947) 79 Cal.App.2d 134 [179 P.2d 380] (*Schied*), accurately encapsulated the *Schmidt* waiver principle as follows: "The authorities are uniform in holding that a party to an executory contract, who, with full knowledge of the facts constituting the fraud complained of, subsequently, *with intention to do so*, affirms the contract and recognizes it as valid, *either by his written agreement or by acts and conduct*, and accepts substantial payments, property or the performance of work or labor not required by the original contract, thereby waives his right to damages on account of the fraud." (*Schied, supra,* at p. 142, italics added; accord, *Storage Services v. Oosterbaan* (1989) 214 Cal.App.3d 498, 512–513 [262 Cal.Rptr. 689]; see also *Clark Equipment Co. v. Wheat* (1979) 92 Cal.App.3d 503, 530 [154 Cal.Rptr. 874] [" 'A careful review of some of the more recent cases' "—quoting from a 1958 decision—indicates there can be no waiver of a right to sue for fraud in the absence of an intentional relinquishment of a known right, and a request for modification of contractual provisions and even the acceptance thereof are simply factors to consider in determining whether the requisite intent of a contractual party to waive a fraud claim was express, or whether it can be implied or inferred from the surrounding circumstances].) (See maj. opn., *ante,* at p. 1184.)

*Schied* also noted, correctly, that determining the issue of fraud waiver ordinarily presents a question of fact, a point the majority acknowledges as a "truism." (*Schied, supra,* 79 Cal.App.2d at pp. 143–144; see maj. opn., *ante,* at p. 1191.)

In line with *Schied* and the waiver rules of intentional relinquishment quoted above, the trial court here properly instructed the jury on the issue of whether the Raiders had intentionally waived its claim for fraud—by expression or by conduct—by instructing as follows: "The term 'waiver'

refers to an intentional relinquishment of a known right. You are instructed that a party to a contract, who, with full knowledge of the facts constituting the fraud complained of, subsequently, with intention to do so, affirms the contract and recognizes it as valid, either by his written agreement or by acts and conduct, and accepts substantial benefits not required by [the] original contract, thereby waives his right to damages on account of the fraud. It is for you, the jury, to determine from all the facts and circumstances shown in the evidence whether [the Raiders] intended to waive its right to recover [fraud] damages from [OACC] by entering into the June 1, 1996[,] agreement [i.e., the June 1996 Supplement]. In order for there to have been such a waiver, it must be established that there was a material change in the agreement to the substantial benefit of the [Raiders], and that the [Raiders] at the time of such change had full knowledge of the facts constituting the fraud."

Thus, the trial court correctly instructed the jury on express waiver (based on words) and implied waiver (based on conduct), recognizing that both types of waiver encompass *intentional* relinquishment. The trial court did not provide what would have been an improper instruction in light of the implied waiver rule: that no waiver could be found unless the Raiders subjectively intended to waive its right to sue for fraud; conduct would not suffice. (See *Rubin v. Los Angeles Fed. Sav. & Loan Assn.* (1984) 159 Cal.App.3d 292, 298 [205 Cal.Rptr. 455].)

As I shall explain, I also think the trial court properly submitted the waiver issue to the jury as a question of fact, and that substantial evidence supports the jury's finding of no waiver. In special verdict No. 5, the jury answered "No" to the following question: "H[as] the Defendants [OACC] proved by clear and convincing evidence that the Raiders intended to and did waive [its] fraud claim . . . when the Raiders entered into the June 1, 1996[,] Supplement?" (See *Waller, supra,* 11 Cal.4th at p. 31 [the party claiming a waiver of a right has the burden of proving the waiver by clear and convincing evidence that does not leave the matter to speculation, and doubtful cases will be decided against waiver].) (See maj. opn., *ante,* at p. 1187, fn. 5.)

Acknowledging several decisions, the majority opinion correctly notes "the truism that the existence of waiver is ordinarily a question of fact." (Maj. opn., *ante,* at p. 1191.) But the majority says the issue of waiver here may be determined as a matter of law because the undisputed facts lead to only one reasonable conclusion: "The facts surrounding the execution of the June 1996 Supplement satisfied all the elements of implied waiver, while the only evidence to the contrary—the Raiders' undisclosed subjective intent to preserve [its] fraud claim—was entitled to no weight whatsoever" (maj. opn., *ante,* at p. 1191, italics omitted); "the Supplement's reduction of the Raiders'

interest rate on two long–term loans *by itself* saved the team $109 million in interest payments." (Maj. opn., *ante,* at p. 1193, original italics.) I disagree for three reasons.

First, there was evidence that the person who drafted the June 1996 Supplement on behalf of East Bay Entities (i.e., OACC and others) surveyed her effort and concluded that "[o]verall, I believe the Supplement is economically favorable to the East Bay Entities . . . ." The majority correctly notes that the implied waiver rule's application does not turn on some sort of comparative benefit analysis between the Raiders and OACC. (Maj. opn., *ante,* at p. 1193.) Nevertheless, a juror may have gleaned from this evidence that the June 1996 Supplement was simply an agreement sought by *both* OACC and the Raiders for their *mutual* benefit, rather than an agreement through which the Raiders, knowing of the fraud, affirmed the validity of the original contract and accepted substantial benefits not found therein, thereby demonstrating an intent to waive any fraud claim regarding the original contract.

Second, one of the Raiders' theories of damages was that by contracting with OACC—pursuant to OACC's fraudulent inducements of "sellouts"—the team lost approximately $544 million in past and future profits and $289 million in franchise value. (See BAJI No. 12.57 ["benefit of the bargain" measure of damages].) The $109 million the Raiders saved in long-term interest payments—via the June 1996 Supplement—pales in comparison to these sums. If a juror accepted this evidence, he or she may have concluded that the June 1996 Supplement was merely a way for the Raiders to cut its fraud losses rather than an agreement through which the Raiders, knowing of the fraud, affirmed the validity of the original contract and obtained substantial benefits not found therein, demonstrating an intent to waive any fraud claim as to the original contract. (See *Smith v. Roach* (1975) 53 Cal.App.3d 893 [126 Cal.Rptr. 29], as characterized in *Storage Services v. Oosterbaan, supra,* 214 Cal.App.3d at p. 512, fn. 7 ["The [contractually] defrauded plaintiffs in *Smith* v. *Roach* . . . were held not to have waived the defendants' fraud just because they had attempted to mitigate their losses through a 'new agreement' with a third party"].)

And third, it bears repeating that we review here the denial of a motion for JNOV. The majority concludes that the motion should have been granted. As the majority opinion recognizes, a JNOV may be granted only if, *"viewing the evidence in the light most favorable to the party securing the verdict* [the Raiders], *the evidence compels a verdict for the moving party* [OACC] *as a matter of law."* (Maj. opn., *ante,* at p. 1194, italics added.) Viewing the evidence above in the light most favorable to the Raiders, the evidence does not compel a verdict for OACC as a matter of law. I would uphold the trial

court's denial of OACC's motion for JNOV and consider the remaining pertinent issues in this appeal.

That brings me to my general concerns about the majority's view of the implied waiver doctrine as applied to waiving a fraud claim.

Prior to the majority's opinion, the *Schmidt* principle governing the waiver of a right to sue for fraud had been interpreted as requiring the *intentional* relinquishment of that right, a known right. This *intentional* relinquishment could be conveyed through words (express waiver) or through conduct (implied waiver), or both. (See, e.g., *Schied, supra,* 79 Cal.App.2d at p. 142; *Clark Equipment Co. v. Wheat, supra,* 92 Cal.App.3d at p. 530.) But *intentional* it had to be.

The majority's new interpretation of the *Schmidt* waiver principle essentially substitutes estoppel for implied waiver, thereby downplaying intent by focusing solely on conduct. As the majority opinion notes, "[w]hile the question of waiver ordinarily turns on the intent of the party against whom it is asserted, estoppel focuses solely on the party's *conduct.*" (Maj. opn., *ante,* at p. 1189, original italics.) This denigrates the pivotal criterion of *intentional* relinquishment of the right to sue for fraud.

Under the traditional view of the *Schmidt* waiver principle, the conduct that will constitute implied waiver of the right to sue for fraud must be so definitive that it is the functional equivalent of express waiver—i.e., a party's conduct must indicate *"an intent to relinquish the right"* (*Waller, supra,* 11 Cal.4th at p. 31, italics added); the conduct must be " *'so inconsistent with an intent to enforce the right* as to induce a reasonable belief that such right has been *relinquished.'* " (*Id.* at pp. 33–34, italics added.) With its focus on *intentional* relinquishment, this traditional view of waiver ensures that implied-waiver conduct meets these exacting standards. The same cannot be said for the concept of estoppel, which focuses solely on conduct absent this critical backdrop of intent. Consequently, the majority has muddled the law by substituting estoppel for implied waiver. And to think the majority started all this mischief simply because of an offhand comment in *Bagdasarian v. Gragnon* (1948) 31 Cal.2d 744, 751 [192 P.2d 935], that " '[t]here is serious doubt whether even a granted request of a [subsequent] favor [between contracting parties], such as an extension of time, should be held to constitute a waiver [of the right to sue for fraud] *in the absence of estoppel* or the making of a new agreement supported by consideration . . . .' " (Maj. opn., *ante,* at p. 1188, italics added in maj. opn.)

With its traditional focus on intentional relinquishment, the issue of whether a party has waived its right to sue for fraud has generally been

considered a question for the fact finder, and with good reason. Determining whether a party has waived a fraud claim is a question a jury is particularly well suited to decide, after evaluating the evidence of the parties' relationship. But the majority's estoppel-based sole focus on the allegedly defrauded party's conduct and whether that conduct may be *deemed* a waiver of the right to sue for fraud, pushes this issue toward the question of law side of the ledger, as the present case well illustrates. Furthermore, because waiving a legal right is serious business, the burden is on the party claiming such a waiver to prove it by the enhanced-proof standard of clear and convincing evidence so as not to leave the matter to speculation; doubtful cases are to be decided against waiver. (*Waller, supra,* 11 Cal.4th at p. 31.)

There may be all sorts of reasons why a defrauded party would try to cut its losses and seek at least half a loaf through a subsequent agreement, without giving up its right to be fully compensated for the fraud arising from the original agreement. But the majority's view of implied waiver—with its estoppel focus on conduct rather than intent—may *deem* this conduct a waiver as a matter of law because the defrauded party has obtained a significant benefit. Using the majority's approach, a wily defrauder could offer some significant benefit to the defrauded party in the hopes of destroying any chance the defrauded party may have of suing for fraud. True, the majority has emphasized, in its calculus, the allegedly defrauded party's affirmation of the original agreement when making the subsequent agreement. But such affirmation would commonly occur where, as here, a subsequent *supplemental* agreement resolves some issues but not all. In that situation, the original agreement is still needed to govern the contractual aspects not governed by the half-a-loaf supplemental agreement. As this court noted in *Schied,* to intentionally relinquish a right to sue for fraud, the allegedly defrauded party, knowing of the fraud, must intend to affirm the original contract *and* recognize it as valid, and must obtain significant benefits outside the original agreement. (*Schied, supra,* 79 Cal.App.2d at p. 142.) Again, such fact-intensive issues are generally best left to the jury's determination, which hears all the evidence of the parties' contractual relationship, rather than to a court which *deems* it knows best as a matter of law before trial.

We must keep in mind that the issue here is the waiver of a right to sue for *fraud.* As the *Schmidt* court noted, "one actually guilty of fraud is not entitled to much consideration; but the real difficulty usually is to determine whether or not the alleged fraud actually existed, and the issue has generally to be determined upon conflicting testimony . . . ." (*Schmidt, supra,* 116 Cal. at p. 270.) I am perplexed as to why the majority feels the need to craft a waiver rule that benefits the alleged defrauder at the expense of the defrauded, and that tends to take the issue of whether a party has waived its right to sue for fraud from the forum best suited to determining that issue: the jurors who hear all the evidence, employing their life experiences and common sense.

The majority's estoppel-based approach to implied waiver muddles the law in this area. That muddle will now make it easier to find that a party has waived a fraud claim as a matter of law, thereby harming many who may actually have been defrauded.