[No. D048189. Fourth Dist., Div. One. June 15, 2007.]

EXPANSION POINTE PROPERTIES LIMITED PARTNERSHIP, Plaintiff and Appellant, v.
PROCOPIO, CORY, HARGREAVES & SAVITCH, LLP, et al., Defendants and Respondents.

44

46

COUNSEL

R.A. Mahavier and R. Anthony Mahavier for Plaintiff and Appellant.

Kirby Noonan Lance & Hoge, David J. Noonan and Steven W. Sanchez for Defendants and Respondents.

OPINION

**McCONNELL, P. J.**—In *Ferguson v. Lieff, Cabraser, Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1046–1053 [135 Cal.Rptr.2d 46, 69 P.3d 965] (*Ferguson*), the California Supreme Court held that as a matter of public policy lost punitive damages in an underlying action are not recoverable as compensatory damages in a legal malpractice action. Plaintiff Expansion Pointe Properties Limited Partnership (Pointe) appeals a summary judgment for defendants Procopio, Cory, Hargreaves & Savitch, LLP, and Steven Strauss (together Procopio), granted on the ground that under *Ferguson* Pointe has no recoverable damages. Pointe contends (1) the general rule of retrospective application of judicial opinions should not apply here as it relied on pre-*Ferguson* law when it signed the retainer agreement with Procopio, and (2) despite a California choice-of-law provision in the retainer agreement, under California conflict of law principles the court erred by not applying Arizona law that is contrary to *Ferguson*. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

During the 1970's and 1980's Pointe entities developed three master-planned communities in the Phoenix, Arizona area, the focal points of which were upscale resorts named The Pointe at Squaw Peak, The Pointe at Tapatio Cliffs and The Pointe at South Mountain. For financial reasons, Pointe brought the Mutual Life Insurance Company of New York (MONY) into the resorts in 1986 under joint venture agreements.

More than 10 years later disputes arose between Pointe and MONY pertaining to the joint venture agreements and the amount of proceeds to which MONY was entitled when Pointe exercised its right to purchase MONY's interest in The Pointe at Tapatio Cliffs, and the amount of proceeds to which MONY was entitled when The Pointe at Squaw Peak was sold to the Hilton Hotel Corporation (Hilton). MONY brought a declaratory relief action against Pointe in United States District Court, District of Arizona.

On October 6, 1998, Pointe retained Procopio, a San Diego law firm, to represent it in the litigation. The retainer agreement states it was entered into in San Diego. It also provides: "Any dispute concerning this agreement shall be determined under the internal laws of the [S]tate of California. Any suit by any party concerning this Agreement shall be filed and tried in San Diego County, California."

Pointe filed a separate declaratory relief action against MONY concerning The Pointe at Tapatio Cliffs, and it was consolidated with MONY's action. Pointe also filed a counterclaim against MONY for breach of contract, breach of fiduciary duty, and breach of the covenant of good faith and fair dealing. Pointe prayed for punitive damages related to the sale of The Pointe at Squaw Peak to Hilton.

MONY moved for summary judgment on the punitive damages claim, arguing there was no evidence that in allocating all of the sale proceeds to itself it acted with "the requisite evil mind" under Arizona law. Pointe argued that "MONY manipulated the closing documents four times on the day of closing escrow; hired its own counsel to represent the joint venture in the resort's sale; repeatedly changed its legal theories to justify its actions"; and knew Pointe expected to receive approximately $15 million from the sale, but falsely claimed the joint venture agreement limited Pointe's share of the proceeds to $300,000.

The court granted the motion and dismissed Pointe's punitive damages claim. The court explained that "even giving [Pointe] the benefit of reasonable inferences from its cited evidence, . . . the evidence does not clearly and convincingly show the requisite evil mind and evil conduct required by the Arizona courts to justify submitting to a trier of fact the issue of punitive damages." The court found the evidence "only demonstrates that MONY kept the proceeds to which it believed it was entitled."

At a jury trial, Pointe defeated MONY's claims and obtained compensatory damages of $16,723,191 related to the sale of The Pointe at Squaw Peak to Hilton.[1]

Pointe then brought this action against Procopio for malpractice and breach of fiduciary duties. As is relevant here, the first amended complaint alleged Procopio failed to fully understand Arizona law on punitive damages, and intentionally failed to present certain evidence in support of Pointe's punitive damages claim that would have defeated MONY's summary judgment motion and resulted in an award of punitive damages in its favor. The first amended complaint prayed for compensatory damages, consisting of lost punitive damages against MONY, and punitive damages under Civil Code section 3294.

Procopio moved for summary judgment, arguing that under *Ferguson, supra,* 30 Cal.4th 1037, Pointe cannot recover lost punitive damages. Alternatively, Procopio argued there was no causal link between MONY's alleged "evil mind" and harm to Pointe, as required by Arizona law.

Pointe argued that in the underlying action Procopio refused to submit two memoranda written by Bob Brooks, managing director of Pointe's resorts at the relevant time. In a May 24, 1991 memorandum, Brooks memorialized conversations he had with several MONY representatives the previous day over the course of several cocktails and dinner. Brooks attributed the following comments to Tom McCahill of MONY: "[T]hese are our assets. You understand we own 96% of Squaw Peak. . . . We are planning on squeezing Bob Gosnell [Pointe's principal] down, which means by the end of the year we are going to take over Squaw Peak. Next June, we've got the management of Tapatio Cliffs and the following December we've got South Mountain. That's going to happen. So, are you getting the picture? Where would your allegiance be, Bob [Brooks]?" Further, McCahill reportedly said, "we are prepared to litigate. Bob [Gosnell] can't last through litigation."

Brooks's June 5, 1991 memorandum was reportedly a transcription of a telephone conversation he had that day with Mark Tobin of MONY.[2] Brooks attributed the following passage to Tobin: "There's only one way it could happen. Its [*sic*] by further dissolution of Gosnell's joint venture interests and using that as a lever[.] . . . And there's a time table for that, which is Squaw Peak[.] . . . Squaw Peak first, then the Cliffs second. And 50% of the management company at South Mountain." Additionally, Tobin reportedly

---

[1] Procopio asserts Pointe also received an award of $16,812,139 for The Pointe at Tapatio Cliffs, but it does not provide an accurate citation to the appellate record.

[2] Analysis of the June 5 memorandum is difficult because quoted material is not attributed to Brooks or Tobin and the context of their conversation is unclear.

said, "That plus the lever would also be anything, any dirt that we uncover between now and the time we decide to uncover it, or decide to take some sort of action against him."

The June 5 memorandum also stated that Tobin told Brooks: "[A]ll of the [*sic*] sudden, all you're doing is saying to [B]ob [Gosnell], you have a choice, pal. Its [*sic*] your choice. You can walk away . . . or you can go to court and live in a fairytale dream to think that your pockets are deeper than MONY's. . . . [Gosnell] can't possibly think that [he] can mount a legal effort that is stronger [than] what we can pay for. We wouldn't be sending out our in-house legal people who do foreclosures. We are going to pick up the phone and call ABA [American Bar Association] and say, who are the biggest asshole litigators you have, and send the bill to this address. And, by the way, they can stay for the next two years on us. With their families."

Brooks's memoranda, however, were not introduced through a declaration by Brooks. Rather, Gosnell's declaration stated the "Brooks memoranda, Exhibits 25 and 26 to Defendant's motion, set forth admissions by MONY representatives as to their evil state of mind; specifically, their intent to deprive the Pointe entities of the benefit of the bargain by 'Buying Justice.' " Gosnell's declaration also stated he flew to San Diego to deliver the Brooks memoranda to Procopio before the discovery cutoff date and "repeatedly sought to have [Procopio] introduce evidence concerning the Brooks memoranda." To Gosnell's knowledge, Procopio made no effort to meet with Brooks or to obtain a declaration from him.[3]

Pointe also submitted the declaration of Attorney Brian Goodwin. The declaration stated that Goodwin reviewed the draft opposition Procopio prepared to MONY's summary judgment motion in the underlying action and advised Procopio it was insufficient to withstand the motion. The declaration also stated Goodwin believed the Brooks memoranda were admissible and he advised Procopio it "needed to and could use the Brooks memoranda," but Procopio declined on the ground they are hearsay.

In its opposition, Procopio objected to the Brooks memoranda on hearsay grounds, and because they were written in 1991, approximately eight years before a dispute arose between Pointe and MONY regarding the sale of The Pointe at Squaw Peak to Hilton. The evidence shows that after MONY obtained summary judgment on Pointe's punitive damages claim in the underlying action, Pointe consulted two attorneys outside the Procopio firm to

---

[3] Pointe also provided Procopio with other voluminous documents to support its punitive damages claim against MONY. Pointe referred to one collection of documents as "The Tome," and to the other collection as the "Punitive Damages Binder." Pointe does not rely on or discuss any particular item from these collections.

discuss the potential for a successful motion for reconsideration based on the Brooks memoranda. Attorney Donald Petrie believed the court would exclude the Brooks memoranda because they were not newly discovered, were hearsay and were not sufficiently probative under Arizona law to establish a prima facie case of punitive damages against MONY. Attorney David Niddrie believed the Brooks memoranda were inadmissible because they were not newly discovered, were "remote in time to the conduct giving rise to the punitive damages claims," lacked credibility because Brooks prepared them to make MONY look bad, were double hearsay, and appeared irrelevant because it was unclear whether their intent was to drive Gosnell out of management or out of the partnership.

The court granted Procopio's motion and entered judgment for it on January 27, 2006. The court found Pointe "has raised a triable issue of fact that [Procopio] might have offered more evidence in support of [Pointe's] opposition to MONY's motion for summary judgment, in order to have the issue of punitive damages go to the jury," but "as a matter of law, punitive damages are not recoverable in California in a legal malpractice action as a form of compensatory damages."

## DISCUSSION

### I

### *Standard of Review*

A "party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he [or she] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) A defendant satisfies this burden by showing " 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' " to that cause of action. (*Ibid.*) In determining whether the moving party met its burden, we review the record de novo. (*Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1143 [97 Cal.Rptr.2d 707].)

### II

### *Retrospective Application of* Ferguson

In *Ferguson,* our high court held that for public policy reasons punitive damages allegedly lost in an underlying action cannot be recovered as compensatory damages in a legal malpractice action. The court explained

that "[m]aking a negligent attorney liable for lost punitive damages would not serve a societal interest, because the attorney did not commit and had no control over the intentional misconduct justifying the punitive damages award. Imposing liability for lost punitive damages on negligent attorneys would therefore neither punish the culpable tortfeasor [citation] . . . nor deter that tortfeasor and others from committing similar wrongful acts in the future." (*Ferguson, supra*, 30 Cal.4th at pp. 1046–1047.) The court also concluded "permitting recovery of lost punitive damages would violate the public policy against speculative damages" (*id.* at p. 1048), "the complex standard of proof applicable to claims for lost punitive damages militates against the recovery of such damages" (*id.* at p. 1049), and "allowing recovery of lost punitive damages as compensatory damages in a legal malpractice action may exact a significant social cost" through increased malpractice insurance or exclusion of coverage for malpractice actions. (*Id.* at p. 1050.)

■ Pointe contends the court erred here by applying *Ferguson* retrospectively. " '[I]t is the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation and that the effect is not that the former decision was bad law but that it never was the law.' " (*In re Retirement Cases* (2003) 110 Cal.App.4th 426, 449 [1 Cal.Rptr.3d 790].) " 'The general rule that judicial decisions are given retroactive effect is basic in our legal tradition.' [Citation.] 'This general principle is subject to two virtually universal exceptions, based on considerations of fairness and public policy. A decision announcing a change in a judicial rule of law is rarely, if ever, a basis for disturbing a final judgment based on the prior rule. [Citations.] Nor will the new decision be applied to impair contracts made or property rights acquired in accordance with the prior rule. [Citations.]' [Citation.] A decision announces a new rule of law, for example, when it disapproves of a long-standing and widespread practice expressly approved by a near-unanimous body of lower court authorities." (*Droeger v. Friedman, Sloan & Ross* (1991) 54 Cal.3d 26, 45 [283 Cal.Rptr. 584, 812 P.2d 931].)

In *Ferguson,* the court resolved a conflict between Courts of Appeal. The court agreed with this court's opinion in *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 962 [105 Cal.Rptr.2d 88] (*Piscitelli*), in which we held that "in legal malpractice actions, permitting a jury to impose punitive damages on a negligent defendant by restyling them as compensatory 'lost punitive damages' is unjust and contrary to public policy." (See *Ferguson, supra*, 30 Cal.4th at p. 1052.) The court disapproved of a 1992 opinion by the Third District Court of Appeal that held the plaintiff in a malpractice action may recover lost punitive damages as an element of compensatory damages (*Merenda v. Superior Court* (1992) 3 Cal.App.4th 1 [4 Cal.Rptr.2d 87] (*Merenda*)). (*Ferguson, supra*, at pp. 1052–1053.)

*Ferguson* was decided on June 9, 2003, nearly a year before Pointe filed its original complaint against Procopio on March 5, 2004. Pointe's retroactivity argument, however, is based on the date of its retainer agreement with Procopio, October 6, 1998. Pointe asserts that in 1998 "California law and Arizona law were comparable in terms of a lawyer's responsibility for negligence," and with "*Piscitelli* and *Ferguson,* California and Arizona law drastically diverged in terms of a lawyer's responsibility for negligence, to Pointe's great detriment. This change unfairly undermines Pointe's reasonable reliance on the previously existing state of the law, and imposes great hardships on Pointe." Pointe asserts that based on *Merenda,* it believed Procopio "would face legal responsibility for the consequences of any negligence, including the loss of punitive damages."

The issue of fairness in applying a judicial decision retrospectively "encompasses the extent of reliance on the old standards by the parties . . . , and the ability of litigants to foresee a change in the law." (*Estate of Propst* (1990) 50 Cal.3d 448, 463 [268 Cal.Rptr. 114, 788 P.2d 628].) "Several factors must be considered in determining whether a decision should be given retroactive application: 'Particular considerations relevant to the retroactivity determination include the reasonableness of the parties' reliance on the former rule . . . .' " (*Bearden v. U.S. Borax, Inc.* (2006) 138 Cal.App.4th 429, 443 [41 Cal.Rptr.3d 482].) The extent and reasonableness of a party's reliance are questions for the trier of fact. (*Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1666 [26 Cal.Rptr.3d 638].)

Procopio contends Pointe waived the retrospective application issue by not raising it at the trial court. In its memorandum of points and authorities, Pointe did not expressly mention the retrospective application of *Ferguson,* although it did cursorily argue *Ferguson* should not be applied because "California law as to [recovery of lost punitive damages in a malpractice action] changed during the pendency of the representation."

■ Pointe asserts we may nonetheless consider the matter because theories pertaining solely to questions of law may be raised for the first time on appeal. "An appellant may be permitted to change his theory when a question of law alone is presented on the facts appearing in the record. In that case, the opposing party is not required to defend for the first time on appeal against a new theory that contemplates a controverted factual situation." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 407, p. 459.) As discussed, however, the issue of a party's reliance on prior law is a question for the trier of fact. For instance, without any citation to the record Pointe asserts "application of *Ferguson* will deprive Pointe of a right that it *bargained heavily on having.*" (Italics added.)

Pointe also asserts Procopio "fully understood, before the trial court, both the fact issues underlying Pointe's appellate arguments, and the essential legal approaches, even if all of the same cases and statutes were not cited to the trial court." Pointe, however, cited *no* legal authority concerning the retrospective application of judicial opinions in its memorandum of points and authorities. Further, Pointe's counsel did not appear for the hearing and instead stipulated to the court's tentative ruling. Additionally, Pointe submitted no evidence that in entering the retainer agreement with Procopio it relied on *Merenda* or even thought about a potential malpractice claim. We cannot presume reliance or consider facts unsupported by the appellate record. (*Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 978–979 [21 Cal.Rptr.2d 834].)

Pointe asserts the following paragraph from Gosnell's declaration shows it raised the retrospective application argument at the trial court: "Subsequent to the execution of the [Procopio] engagement letter, . . . Pointe was not made aware of a change in California's case law as to the ability of . . . Pointe to pursue [Procopio], given [its] deliberate denial of [its] client's wishes, then the loss of punitive damages. I have recently learned that this change commenced in 2001 during the time in which we were pleading with [Procopio] to introduce the evidence for the theories of 'Evil Mind,' along with the related evidence. . . . [Procopio] did not advise us as to this **significant change in his engagement.** Had [it] done so, there is no question, given the continued refusal to introduce 'Evil Mind' with malpractice now potentially not being a method of recovery, . . . Pointe would have dismissed [Procopio] as our counsel. Procopio was the only California counsel we had at the time."

The documentation filed in conjunction with the motion for summary judgment, however, was voluminous and the trial court was not required to comb through it to find evidence to support a retroactivity argument that Pointe did not expressly raise or support with legal authority in its memorandum of points and authorities. Further, Pointe did not cite the above paragraph from the Gosnell declaration in its separate statement as required. (Code Civ. Proc., § 437c, subd. (b)(3).)

"Generally, the rules relating to the scope of appellate review apply to appellate review of summary judgments. [Citation.] An argument or theory will . . . not be considered if it is raised for the first time on appeal. [Citation.] Specifically, in reviewing a summary judgment, the appellate court must consider only those facts before the trial court, disregarding any new allegations on appeal. [Citation.] Thus, *possible theories that were not fully developed or factually presented* to the trial court cannot create a 'triable issue' on appeal." (*American Continental Ins. Co. v. C & Z Timber Co.* (1987) 195 Cal.App.3d 1271, 1281 [241 Cal.Rptr. 466], italics added.) "A party is

not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant." (*Ernst v. Searle* (1933) 218 Cal. 233, 240–241 [22 P.2d 715].) We deem the matter waived.

■ Even absent waiver, however, we would find against Pointe on the issue. Under Pointe's theory that the Gosnell declaration shows retrospective application of *Ferguson* would be unfair, we must decide whether Procopio had a duty to learn about and advise Pointe of the *Piscitelli* or *Ferguson* opinions. We agree with Procopio that it had no such duty. An attorney has a duty to "respond promptly to reasonable status inquiries of clients and to keep clients reasonably informed of significant developments in matters with regard to which the attorney has agreed to provide legal services." (Bus. & Prof. Code, § 6068, subd. (m).) Similarly, rule 3-500 of the State Bar Rules of Professional Conduct provides a "member shall keep a client reasonably informed about significant developments relating to the employment or representation, including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed."

■ Under the retainer agreement, Procopio agreed to adequately represent Pointe in the MONY litigation. Pointe cites no authority suggesting an attorney has a duty to discuss—either at the inception of the attorney-client relationship or later in the representation—the various types of recovery a client may obtain in a potential malpractice action against him or her. Further, attorneys do not commit malpractice based on the state of the law pertaining to malpractice damages, and there is no suggestion that when *Piscitelli* and *Ferguson* were decided Procopio believed Pointe had a potential malpractice claim against it. Because Procopio had no reporting duty, Pointe's reliance argument fails on substantive grounds.

Pointe cites *Janik v. Rudy, Exelrod & Zieff* (2004) 119 Cal.App.4th 930 [14 Cal.Rptr.3d 751] (*Janik*), for the proposition an attorney "has a duty to alert the client to legal problems which are reasonably apparent, even though they fall outside the scope of the retention." In *Janik,* the issue was whether attorneys for the plaintiff class owed class members a duty of care to consider and protect their interests pertaining to any claims they may have beyond the claims specified in the class certification order pertaining to unpaid overtime wages due under the Labor Code. (*Id.* at pp. 936–937.) The court analogized a class certification order to a retainer agreement and rejected the defendants' "broad assertion that 'an attorney cannot be sued in malpractice for failing to raise claims beyond the scope of a retainer agreement.' " (*Id.* at p. 940.) The court held that while the scope of the attorney-client relationship may be limited by the retainer agreement, "an attorney who undertakes one matter on

behalf of a client owes that client the duty to at least consider and advise the client if there are apparent related matters that the client is overlooking and that should be pursued to avoid prejudicing the client's interests." (*Ibid.*)

The *Janik* court concluded that "a cause of action under the UCL [unfair competition law] would have been based on precisely the same practice, and subject to much the same legal analysis, as the certified cause of action under the Labor Code. . . . Class counsel therefore were obliged to consider the advantages and disadvantages to the class of seeking to add a UCL cause of action to their complaint, to bring these considerations to the attention of the class representatives, and to take or recommend such action . . . ." (*Janik, supra*, 119 Cal.App.4th at pp. 942–943.) *Janik* is inapplicable as it pertains to claims against third parties arising from the same course of conduct.

██ Additionally, Pointe's contention that the retroactive application of *Ferguson* impairs its vested contract rights is erroneous. "It is well settled the existing applicable law is part of every contract, the same as if expressly referred to or incorporated in its terms." (*People v. Gipson* (2004) 117 Cal.App.4th 1065, 1069 [12 Cal.Rptr.3d 478].) "[W]here a constitutional provision or statute has received a given construction by a court of last resort, and contracts have been made or property rights acquired in accordance with the prior decision, neither will the contracts be invalidated nor will vested rights be impaired by applying the new rule retroactively." (*Peterson v. Superior Court* (1982) 31 Cal.3d 147, 152 [181 Cal.Rptr. 784, 642 P.2d 1305].) Again, the retainer agreement was for Procopio's representation of Pointe in the MONY litigation, the agreement did not contain any terms pertaining to a potential malpractice action, and there is no suggestion Pointe entered into it in reliance on the *Merenda* opinion.

██ Under Pointe's theory and showing, any retainer agreement entered into before *Ferguson* was decided would not be subject to its limitation in a later malpractice action. Given the numerous public policy reasons outlined in *Ferguson* for excluding lost punitive damages as compensatory damages in a malpractice action, such a holding would be against public policy. The court properly applied *Ferguson* retroactively.[4]

_____

[4] Pointe's reliance on *Moradi-Shalal v. Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58], is misplaced. In *Moradi-Shalal,* the court overruled *Royal Globe Ins. Co. v. Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], and held there is no private right of action under Insurance Code section 790.03. (*Moradi-Shalal, supra*, at p. 304.) The court explained that "[w]ithout implying any broad exception to the general rule of retrospectivity [of a court of supreme jurisdiction overruling a former decision], and in the interest of fairness to the substantial number of plaintiffs who have already initiated their suits in reliance on *Royal Globe,* we hold that our decision overruling that case will not apply to those cases seeking relief under [Insurance Code] section 790.03 filed before our

III

*Choice-of-law Clause*

A

Additionally, Pointe contends the retainer agreement's choice-of-law clause is unenforceable under estoppel principles because Procopio "gained Pointe's continuing assent to the terms of the [r]etainer [a]greement through a constructive concealment of facts, and through a breach of a duty to speak."

 " 'The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment.' [Citation.] The traditional elements of estoppel are: ' "(1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." ' " (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1189 [51 Cal.Rptr.3d 144].)

Pointe, however, did not raise an estoppel argument at the trial court, and thus waived the matter. In any event, as we have concluded, Procopio had no duty to learn about or discuss the *Piscitelli* or *Ferguson* decisions with Pointe. Since Pointe's estoppel argument is based on the asserted breach of duty, it is without merit.

B

Alternatively, Pointe contends that even if the choice-of-law clause is valid and enforceable, under California conflict of law rules the court should have applied Arizona law. In *Elliott v. Videan* (1989) 164 Ariz. 113, 119–120 [791 P.2d 639] (*Elliott*), the Arizona Court of Appeals held that if "an attorney's negligence is the cause of dismissal of the underlying claim, the proper measure of damages is all compensatory and punitive damages awarded by the jury in the trial of the case within a case." The court noted that "Arizona has traditionally held that a tortfeasor is liable for all damages that occur as a result of the commission of the tort." (*Id.*, 791 P.2d at pp. 645–646.) The court rejected the argument that lost punitive damages

decision here becomes final." (*Moradi-Shalal, supra,* at p. 305.) Pointe's action against Procopio is only a single action, and it was not pending when *Ferguson* was decided.

were unavailable in a malpractice action " 'because of the difficulty a jury may have in arriving at the damages occasioned by [the] negligence.' " (*Id.* at p. 645.)

Pointe, however, acquiesced to the choice-of-law clause by filing and prosecuting its action in San Diego County Superior Court and seeking damages against Procopio based on a California statute, Civil Code section 3294. It cannot now seek the selective application of Arizona law to its claim for lost punitive damages as an element of compensatory damages. "When a rational businessperson enters into an agreement establishing a transaction or relationship and provides that disputes arising from the agreement shall be governed by the law of an identified jurisdiction, the logical conclusion is that he or she intended that law to apply to all disputes arising out of the transaction or relationship." (*Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 469 [11 Cal.Rptr.2d 330, 834 P.2d 1148], italics omitted (*Nedlloyd*).) Further, in its memorandum of points and authorities in opposition to the summary judgment motion, Pointe neither developed a particular argument nor cited any legal authority pertaining to choice-of-law standards.

Even absent waiver, however, we are unpersuaded by Pointe's contention. "In determining the enforceability of arm's-length contractual choice-of-law provisions, California courts shall apply the principles set forth in Restatement [Second of Conflict of Laws] section 187, which reflects a strong policy favoring enforcement of such provisions." (*Nedlloyd, supra,* 3 Cal.4th at pp. 464–465.)

Subdivision (2) of the Restatement Second of Conflict of Laws (Restatement), section 187 is at issue here.[5] In *Nedlloyd, supra,* 3 Cal.4th at page 466, the court instructed that "the proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a fundamental policy of California. If there is no such

---

[5] Subdivision (2) of Restatement, section 187 provides: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either [¶] (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [Restatement,] [section] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

conflict, the court shall enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a 'materially greater interest than the chosen state in the determination of the particular issue . . . .' [Citation.] If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." (Fns. & italics omitted.)

In *Nedlloyd*, the forum state was California and the issue was whether the law of the chosen jurisdiction, Hong Kong, should be applied. (*Nedlloyd, supra*, 3 Cal.4th at p. 467.) Here, the forum state and chosen state are both California, and the issue is whether the law of Arizona should nonetheless apply. In *Discover Bank v. Superior Court* (2005) 134 Cal.App.4th 886, 891, footnote 1 [36 Cal.Rptr.3d 456], the court observed: "Technically, the inquiry is not whether there is a conflict with a fundamental policy of California, but whether there is a conflict with a fundamental policy of the state whose law would apply under Restatement section 188 in the absence of a contractual choice of law. (Rest., § 187, subd. (2).)" (Italics omitted.)

The substantial relationship and reasonable basis tests are met when one of the parties is domiciled in the chosen state. (*Nedlloyd, supra*, 3 Cal.4th at p. 467; *Smith, Valentino & Smith, Inc. v. Superior Court* (1976) 17 Cal.3d 491, 494 [131 Cal.Rptr. 374, 551 P.2d 1206].) Those tests are met here as Procopio's principal place of business is California and the individually named defendant, Strauss, is a California resident. Pointe asserts it is a resident of Arizona, but it cites no supporting evidence. The evidence does show that Pointe's chief executive officer, Gosnell, resides in San Diego; Pointe has never had any employees, officers or directors other than Gosnell; and Gosnell testified in deposition that Pointe's sole remaining purpose was to prosecute the malpractice action against Procopio.

 Pointe contends Arizona law would apply in the absence of the choice-of-law provision in the retainer agreement. Under Restatement, section 188, in the absence of an effective choice-of-law provision, the court is to consider "relevant contacts," which include "(a) the place of contracting, [¶] (b) the place of negotiation of the contract, [¶] (c) the place of performance, [¶] (d) the location of the subject matter of the contract, and [¶] (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." (Rest., § 188, subd. (2)(a)–(e).) These contacts must not be

applied mechanically (*Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 904 [72 Cal.Rptr.2d 73]), but rather "are to be evaluated according to their relative importance *with respect to the particular issue.*" (Rest., § 188, subd. (2), italics added.) We analyze the Restatement, section 188 factors "to aid in selecting the law which will be most fair and equitable, which will be in accord with the relevant policies of the forum state[ and] which will accord with the parties' expectations." (*ABF Capital Corp. v. Grove Properties Co.* (2005) 126 Cal.App.4th 204, 222 [23 Cal.Rptr.3d 803].)

■ The retainer agreement states it was entered into in California. Additionally, Procopio's place of business is California and Gosnell resides here. Without any evidentiary basis, Pointe asserts that "presumably, Pointe . . . signed and either mailed or faxed the agreement back to [Procopio] from Arizona—thus forming the contract in Arizona." Also lacking any evidentiary support is Pointe's assertion it would have negotiated the retainer agreement from Arizona. Parties are required to include citations to the record in their briefs, and the absence of citations allows us to treat an issue as meritless. (*Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

The retainer agreement's subject matter and Procopio's performance were in Arizona, and that state, of course, has an interest in the performance of attorneys it admits to practice before its courts on a *pro hac vice* basis. The relevant issue in assessing the Restatement, section 188 factors, however, is the California malpractice action, not the underlying Arizona action. (Rest., § 188.) When the parties entered into the retainer agreement the subject matter and place of performance were known and specified, and yet they selected California as both the forum state and the state whose law would be applied to any malpractice action, presumably because they are domiciled here. Thus, there was no surprise or unfair advantage and application of California law met the parties' expectations. Further, " 'in the absence of an effective choice of law by the parties' as an initial proposition, California would normally apply its own 'governmental interests' test. [Citation.] *That* test begins with applying the law *of the forum state*, i.e., California, unless there is some reason not to." (*ABF Capital Corp. v. Grove Properties Co., supra*, 126 Cal.App.4th at pp. 221–222.) We conclude California law would have applied here even in the absence of the choice-of-law provision in the retainer agreement.

Moreover, regardless of the Restatement, section 188 factors, enforcement of the choice-of-law provision in the retainer agreement was proper because Arizona's interest in the matter is not materially greater than California's. Procopio is a California law firm governed by the laws of California, and for sound public policy reasons our high court has held that California attorneys

are not subject to speculative and potentially exorbitant lost punitive damages that may bear no relation to the attorneys' wealth or ability to pay. (*Ferguson, supra,* 30 Cal.4th at pp. 1047–1049.) This case illustrates the dangers of another holding, as Pointe sought to saddle Procopio with between $48 and $160 million in lost punitive damages, figures that are approximately three to 10 times the compensatory damages award Procopio obtained for Pointe pertaining to the sale of The Pointe at Squaw Peak to Hilton. In *Ferguson,* the court noted that out-of-state cases such as *Elliott, supra,* 791 P.2d 639, "provide little or no analysis and permit recovery of lost punitive damages solely based on the general rule that the measure of damages in a legal malpractice action is the value of the lost claim. These cases largely ignore public policy—including the public purpose of punitive damages." (*Ferguson, supra,* 30 Cal.4th at p. 1052 & fn. 2.)[6]

 Further, in *Ferguson* the court was concerned with the effect of lost punitive damage awards on the affordability and availability of malpractice insurance to protect *California* consumers and attorneys, a matter not generally relevant to Arizona courts. (*Ferguson, supra,* 3 Cal.4th at p. 1050.) Another state does not have a materially greater interest in a matter when for fundamental public policy reasons California seeks to protect its citizens from a certain type of claim (see *Nedlloyd, supra,* 3 Cal.4th at p. 466; *Klussman v. Cross Country Bank* (2005) 134 Cal.App.4th 1283, 1300 [36 Cal.Rptr.3d 728]), which is the situation here. Additionally, Pointe claimed punitive damages against Procopio under California's Civil Code section 3294, and Arizona has no interest in that claim. (See *Discover Bank v. Superior Court, supra,* 134 Cal.App.4th at pp. 894–895.)

Contractual choice-of-law clauses are "usually respected by California courts" (*Smith, Valentino & Smith, Inc. v. Superior Court, supra,* 17 Cal.3d at p. 494), and the issue is one for the court's discretion. (*In re Marriage of Crosby & Grooms* (2004) 116 Cal.App.4th 201, 204 [10 Cal.Rptr.3d 146].) Pointe made no showing the choice-of-law clause in the retainer agreement was invalid or unreasonable, and thus the court properly exercised its discretion by applying it. In turn, the court properly granted Procopio summary judgment as a matter of law based on *Ferguson.*[7]

---

[6] Other states also bar the recovery of lost punitive damages as an element of compensatory damages in malpractice actions. (See, e.g., *Tri-G v. Burke, Bosselman & Weaver* (2006) 222 Ill.2d 218 [305 Ill.Dec. 584, 856 N.E.2d 389, 417–418]; *Summerville v. Lipsig* (N.Y.App. 2000) 270 A.D.2d 213 [704 N.Y.S.2d 598].)

[7] Given our holding, we are not required to consider Procopio's contention that the Brooks's memoranda were inadmissible in the MONY litigation for a variety of reasons, and thus Pointe failed to raise a triable issue of fact as to whether Procopio could have submitted additional evidence in support of Pointe's punitive damages claim in that action.

## DISPOSITION

The judgment is affirmed. Procopio is entitled to costs on appeal.

Benke, J., and McIntyre, J., concurred.