Filed 11/12/13  Maria P. v.Super. Ct. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| MARIA P.,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF LOS ANGELES,<br><br>    Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Real Party in Interest. | No. B250456<br><br>(LASC Case No. CK76798)<br> Marilyn Martinez, Commissioner |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Marilyn Martinez, Commissioner.  Petition denied.

Luke Jackson, for Petitioner.

Children's Law Center of Los Angeles, Patsy Moore for No.P.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, David Nakhjavani, Deputy County Counsel for Real Party In Interest.

## INTRODUCTION

M.P. (mother), the mother of No.P. and his four siblings, petitions for extraordinary relief pursuant to California Rules of Court, rule 8.452 (petition). Mother seeks review of an order setting a permanent plan hearing under Welfare and Institutions Code section 366.26[1] as to No.P. Mother contends that the juvenile court abused its discretion by previously ordering No.P. separated from his siblings despite the reports of the Department of Children and Family Services (the Department) not stating the reason why the juvenile court should do so; erred by requiring an offer of proof from her counsel prior to setting the permanent plan hearing as to No.P.; and erred in that there was not substantial evidence that mother's visitation of No.P. was harmful to No.P. The Department filed an answer to the petition, and No.P. joined in that answer. We deny the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother is the mother of Na.P., a 15-year-old girl, J.P., a 12-year-old girl, C.P., an 11-year-old girl, P.U., an 8-year-old boy, and No.P., a 6-year-old boy. No.P. is the only child who is the subject of the petition.

### A.     History of Child Welfare Issues

The Department filed a detention report, dated April 6, 2009, stating that in 2001 mother and her children at that time came to the attention of the Department based on allegations of physical abuse of the children, and from August 2001 through February 2002, the family participated in a voluntary family maintenance program (VFM). In 2008, the Department received another referral alleging that No.P.'s siblings—Na.P., J.P., C.P., and P.U.—were being physically abused, and "a number of referrals" alleging general neglect and physical abuse of the children. The Department reported that when the children's social worker (CSW) visited the children in October 2008, P.U., C.P., J.P.,

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

and Na.P. all had marks and bruises, including lacerations, scratches, and scabs. All the children except Na.P. stated that mother would repeatedly hit them, and C.P. stated that mother hit all of the children, except "the baby," No.P. The Department conducted team decision making meetings (TDM), mother agreed to participate in another VFM and additional parenting classes, and the Department decided that the children were to continue to reside with mother.

### B. Current Allegations

The April 6, 2009, detention report stated that on March 27, 2009, a CSW went to the children's school to complete a monthly contact with Na.P. and C.P. During the visit, Na.P. stated that mother continued to physically abuse P.U., C.P., J.P. and Na.P.; Na.P started to cry and stated she was afraid to go home. C.P. told the CSW that mother would pull her hair and it hurt "a lot," and mother continued to hit her and all of her siblings except No.P. J.P. stated that mother sometimes used her hand, and other times used a clothes hanger, to hit them. J.P. did not want to go home. P.U. stated that mother would hit him "a lot, a lot, a lot, a lot," and he pointed to his neck to show the CSW where mother had hit him with a hanger. No.P., who was two years old at the time, was too young to provide a meaningful statement.

The detention report stated that on April 1, 2009, the Department conducted a TDM during which the Department learned that mother would leave the children without proper supervision or sufficient amounts of food, had attended one parenting session, and stopped attending individual counseling. When asked about the allegations made against her during the TDM, mother stated, "If you want to believe what is being said then go ahead."

According to the detention report, mother stated that she did not want her children residing with any family members and would rather have the children placed in foster homes. The Supervising CSW advised mother that it would be very difficult for the Department to find a placement for the children in their area, and stated that placing the children in foster homes could further traumatize the children, especially when there were

3

family members willing to care for the children. Mother stated, "I prefer the children [are placed] in a foster home so that they can see if they want to live in a foster home or with me." Mother also indicated she would not cooperate with services or sign a safety plan. The Department took the children into protective custody.

On April 6, 2009, the Department filed a section 300 petition on behalf of the children based on, inter alia, the mother's physical abuse of C.P., P.U., Na.P., and J.P., including incidents where mother had physically hit them with her hands, shoes, cables, sticks, and hangers. At the April 6, 2009, detention hearing, the juvenile court found a prima facie case for detaining the children and that they were minors described by section 300, subdivisions (a), (b), (g), and (j). P.U. was released to his father's custody. No.P. and his other siblings—C.P., Na.P., and J.P.—were ordered detained in shelter care. At the April 28, 2009, non-appearance progress hearing, the juvenile court ordered C.P., Na.P., and J.P. detained with their maternal aunt, and that No.P. continue to be detained in shelter care.

The Department's April 30, 2009, jurisdiction/disposition report stated that No.P. had been placed with L.O., a non-related extended family member. Na.P. stated, "I feel terrified about my mom. I want her to stop hitting us." J.P. stated, "[mother] hits us with a hanger, right here (arm) like 8 times. . . . She pulled Na.P.'s hair. She hit [C.P.] too. . . . She hit us with her hand and with her shoe. It's a boot that my mom wears. I want her to stop hitting us. I want to stay with my aunt." C.P. stated, "My mom treats us bad." Mother minimized the allegations of physical abuse, stating that, "I think [Na.P.] got this idea from school."

The April 30, 2009, jurisdiction/disposition report stated that mother said she had visited J.P., Na.P., and C.P. on one occasion since the children were detained. According to mother, she was visiting No.P. almost daily but she stopped visiting with him because she had a confrontation with L.O., No.P.'s caregiver. She also had not visited P.U. due to alleged difficulties in arranging visits with the father.

At a hearing held on May 27, 2009, the juvenile court sustained the petition and declared the children dependents of the court. P.U. was released to his father's custody

4

with a family law order granting the father sole legal and physical custody, and jurisdiction over him was terminated. The juvenile court granted mother family reunification services, ordered mother to complete a 20-week parenting course and participate in individual counseling with a licensed therapist to address case issues, including mother's anger management issues, and granted mother monitored visits with the children.

In its November 25, 2009, status review report, the Department stated that the assigned CSW had trouble contacting mother during the latest period of supervision. According to the report, on August 11, 2009, mother would not provide the CSW with mother's address and mother stated that she had contacted the CSW on a friend's telephone. The CSW only was able to meet with mother on one occasion. Mother reported she was nine months pregnant, scheduled to deliver the child on November 25, 2009, and was living with her boyfriend, the father of her unborn child.

The November 25, 2009, status review report stated that No.P. continued to reside with L.O. and L.O.'s boyfriend, was meeting his developmental milestones, appeared attached to his caregivers, and called L.O. "mommy" and L.O.'s boyfriend, "Papi." L.O. stated that she would be interested in adopting No.P. should mother fail to reunify with him.

According to the status review report, on April 15, 2009, the Department set up a schedule with mother to visit No.P. and the other children. When the CSW contacted the children's caregivers, however, they stated that mother had not contacted them to arrange any visits.

The status review report stated that on November 13, 2009, mother had a monitored visit with the children. During the visit, mother tried "to get close" to No.P., but he would not acknowledge mother. Mother cried when she spoke to No.P.

The November 25, 2009, status review report stated that mother said that she had not started her court ordered services due to her pregnancy. According to the report, mother had "made no progress in Court ordered services. . . . . [Mother] ha[d] failed to enroll in parenting, individual counseling and ha[d] not made any attempt to visit any of

5

her children.  At this time, it would be detrimental to the children's well being to have them return to mother's care."  The Department recommended that the juvenile court terminate mother's family reunification services, and at the November 25, 2009, six-month review hearing, the juvenile court terminated those services.

On March 24, 2010, the Department filed a section 366.26 report stating that L.O. and her boyfriend were interested in adopting No.P.  No.P. was attached to his caregivers and called them "mama" and "papi."  L.O., No.P.'s caregiver, was a family friend who had been in frequent contact with the children prior to their detention.

On January 27, 2011, the Department reported that No.P. had resided with L.O. and her boyfriend since April 2009.  No.P. identified L.O. as his mother and had developed a strong emotional attachment toward her and her family.  The adoption, however, could not take place because L.O. was legally married to her ex-husband from whom she had separated, and the whereabouts of her husband were unknown.  The Department recommended that No.P. remain with L.O. and her boyfriend under a plan of guardianship.  The Department stated, "If the caregiver obtains a divorce or she is able to locate her husband and have the spousal waiver signed, the adoption process can be re-activated."

At a hearing held on January 27, 2011, mother was not present and her counsel stated that she had no direction from mother regarding the status of the case.  The juvenile court found by clear and convincing evidence that Na.P., J.P., and C.P. were adoptable and terminated mother's parental rights over them.  No.P.'s counsel stated that mother had not been visiting No.P.  The juvenile court ordered mother to have one monitored visit per year, if mother so desired.  Mother's counsel did not object to this visitation order.

At the hearing, L.O. and her boyfriend stated that they wanted to become No.P.'s legal guardians.  The juvenile court stated that they wished to adopt him but because L.O.'s husband could not be contacted to finalize the divorce, L.O.'s home study could not be approved and the juvenile court could not proceed with adoption.  The juvenile

court appointed L.O. and L.O.'s boyfriend as No.P.'s legal guardians and stated that it would revisit the issue of adoption at a later time.

The Department filed a status review report, dated June 30, 2011, stating that No.P. was then four years old, appeared to be a healthy and active child, and was developmentally on track. The Department filed a status review report, dated December 8, 2011, stating that on October 28, 2011, mother had contacted the CSW attempting to schedule a visit with No.P. The CSW scheduled a visit for mother in November, but mother stated she would not be able to see No.P. that week and indicated she would call back to reschedule. Mother did not contact the CSW to reschedule the visit. The Department filed a status review report, dated June 7, 2012, stating that mother had not contacted the CSW to arrange to visit with No.P.

At the June 7, 2012, review of permanent plan hearing, the following exchange occurred: "[Juvenile court:] According to the report, your child is well cared for by his guardians, and you have not visited him. Do you have any questions or comments? [¶] [Mother:] I want to know if I still have the option of recovering my son? [¶] [Juvenile court:] You always do because I have not terminated your parental rights. You are still the child's mother. When you believe that you have complied with the prior orders of this court, that you are living a sober and stable lifestyle, you may file a [section] 388 petition, and you'll want to advise me of the new evidence and persuade me that it would be in [No.P.'s] best interest to return to you. So the answer is yes. [¶] . . . [¶] It would also be very important that you . . . stay in regular communication with the social worker and keep the social worker advised of your status. [¶] . . . [¶] When I granted the guardianship, you hadn't had any contact with your child; so I ordered once a year. The guardians can authorize more frequently, but you will have to contact the social worker to set up at least your first visit because you haven't had any this year. And, once you set up your first visit, if it goes well, then you may have it more frequently."

On June 18, 2012, mother visited No.P. at the Department's office. During the visit, No.P. sat on the sofa, face down, with a serious demeanor. He did not talk to

7

mother. When mother asked No.P. questions, he responded by nodding his head. At the end of the visit, mother asked for a kiss but No.P. was not responsive. After the visit, No.P. stated that he did not recognize mother.

On August 9, 2012, mother filed a section 388 petition stating that she had enrolled in a parenting class and was renting a two-bedroom apartment with her fiancé. She asked that the juvenile court grant her overnight weekend visits with No.P so that she could start bonding with him and obtain custody of him in the future. On September 7, 2012, the juvenile court summarily denied mother's petition, finding that the best interests of No.P. would not be promoted by the requested modification. The juvenile court denied the petition because "mother just one month ago enrolled in parenting [classes], so she is only at [the] beginning of that course. No other verification for other court ordered prog. and according to the Court Report 6-7-12, mother has not been visiting [No.P.]."

On October 1, 2012, mother filed another section 388 petition. She reiterated her enrollment in parenting classes and "reminded" the juvenile court that she only had been granted one visit per year with No.P. She again requested that the court grant her overnight, weekend visits. On October 5, 2012, the juvenile court summarily denied mother's petition, finding that "the best interest of [No.P.] would not be promoted by the proposed change of order." The juvenile court denied the petition because "[mother] is still at beginning of parenting & counseling courses. Mother's visits are limited—she cancelled a visit for Nov. 2011 & didn't call social worker . . . to reschedule until about June 2012. [No.P.] is stable with guardians, so request is not in child's best interest."

On December 3, 2012, mother filed another section 388 petition. She stated that she had completed parenting classes and individual counseling and wanted to have weekend visits with No.P. On December 6, 2012, the juvenile court denied mother's petition, finding that "the best interests of [No.P.] would not be promoted by the

8

proposed change of order."[2] In denying the petition, the juvenile court stated that it "allowed discussion on 12-6-12. Mother has visited only 1/yr. [No.P. is] very bonded to guardian. Per [No.P.'s] therapist mother's requests could be disturbing to [No.P.]." The juvenile court, however, granted mother visits with No.P. every other month, to be arranged through the CSW.

In its December 6, 2012, status review report, mother stated that both she and her husband had been incarcerated for an "altercation" but were released and "able to work through it." Mother did not provide any additional details regarding the incident.

The status review report stated that No.P. is receiving mental health services, and his therapist stated, "[No.P.] has established strong emotional bonds and attachment with [L.O. and her boyfriend] whom he refers to as his mother and father. [No.P.] feels loved and safe with [L.O. and her boyfriend] and depends on them for all his needs. . . . Since his placement with [L.O.] 3 1/2 years ago, [No.P.'s] contact with [mother] has been very sporadic and minimal. Given the intensity of [No.P.'s] attachment to his current family and the years he has learned to depend on his current family for his needs to establish trust and self worth, and separation between [No.P.] and his current legal guardian will be experienced as traumatic." (Italics omitted.)

According to the June 6, 2013 status review report, in February 2013, mother had another visit with No.P. Mother arrived at the visit with her husband and their baby. Mother brought No.P. a cake and felt bad when No.P. did not want to eat a piece. The visit only lasted 30 minutes, during which mother's 2-year old child, who was being supervised by mother's husband, kept running into the visitation room, asking for cake, and punching and biting mother's arm. Mother was upset at the conclusion of the visit, told the CSW that she drove from Victorville to see No.P., and it seemed as though the child "was not trying."

The Department's status review report, dated June 6, 2013, stated that in April 2013, mother visited with No.P. A Human Services Aid attended the visit because the

---

[2] Mother never appealed the juvenile court's summary denials of her section 388 petitions.

9

CSW was not available to attend it. At the beginning of the visit, No.P. stood behind L.O. and stated that he did not want to go into the room to visit mother. No.P. stated that he "would not mind" if the visit took place in the waiting room, but mother postponed the visit because she wanted the visit to be "in private and not in front of people." Mother believed No.P. did not want to visit because the CSW was not there. A few days thereafter, No.P. informed the CSW that he did not want to visit with mother. The CSW tried to talk to No.P. and ask him why he did not want to visit, but No.P. was not able to give a response and just stated he did not want to see mother.

According to the status review report, L.O. stated that her marital divorce was now final, and she wished to adopt No.P. Mother stated that should the juvenile court decide not to give her custody of No.P., she would feel sad but she would be alright "all this is affecting No.P. emotionally." Mother stated that she was "looking out" for No.P.'s best interest. The Department recommended No.P. remain with L.O., the juvenile court terminate mother's parental rights, and the juvenile court free No.P. to be adopted by L.O. and her boyfriend.

The juvenile court held a hearing on June 6, 2013. No.P.'s counsel stated that adoption was the appropriate plan for No.P., and asked that the juvenile court set a section 366.26 hearing and order that No.P. not have any further visits with mother. Mother's counsel stated that "terminating [mother's] parental rights is extreme, and we would like to preserve the status quo, if possible, where she is allowed visitation and trying to fix the bond with [No.P.]. [¶] [No.P.'s] very young, and I don't think he's quite capable of making decisions to terminate his relationship with [mother], and so we oppose the adoption and would like to have more visitation so my client can see [No.P.] more frequently."

At the June 6, 2013, hearing the following exchange occurred: [Juvenile Court:] "I will set the matter for a 366.26 hearing. [¶] . . . [¶] And in order for me to consider setting the selection and implementation hearing pursuant to [section] 366.26 for contested hearing, I will need an offer of proof, [mother's counsel]. [¶] Do you have anything to add as an offer of proof other than what it is you stated?" [¶] [Mother's

10

counsel:] "Not presently, your honor." [¶] [Juvenile Court:] Assuming that is a request to contest the recommendation to terminate parental rights, I find that there is not an offer of proof sufficient to persuade me that if I set the matter for contest, there's any reasonable likelihood that I would find that it would be detrimental to terminate parental rights or some other reason that would preclude adoption."

At the hearing, the juvenile court stated regarding visitation that, "I've not yet terminated [mother's] parental rights; however, we are well beyond reunification. Once we are beyond reunification, the focus shifts from the relationship between a child and parent, or mother as we have here, to providing the child with permanency and stability. [¶] The last visits, there was one in December and one in February. So the visits are minimal at best. The most recent in February—actually I think there was one also scheduled on April 12th. At the February hearing, mother was about—the visit only lasted 30 minutes because [mother] became very upset, and the visit had to be terminated. [No.P.] was exposed to this. [¶] And I now find that it is detrimental by the preponderance of the evidence for [No.P.] to have contact with his mother. Her efforts to contact him and visit with him have been minimal at best. As I said, one in December. The next one in February turned out badly as her conduct was very upsetting, and the monitored had to terminate the visit such that the next one, April 12th, [No.P.] absolutely refused to visit. [¶] [No.P.] does have some special needs. He's in special education. He's in therapy. His caretakers are ensuring that his needs are met. [¶] We must focus on providing him with permanency and stability and not subjecting him to situations that cause him stress and turmoil. So he shall not have contact with mother pending further order of the court."

We denied the petition's request that we immediately stay the section 366.26 hearing, and set a hearing on an order to show cause why the relief prayed for in the petition should not be granted.

11

## DISCUSSION

### A. Separation from Siblings

Mother contends that the juvenile court abused its discretion by ordering that No.P. be "separated . . . from his older brothers and sisters," arguing that "the reports" need to state the reason why the children were not placed together, "and a review of the record fails to disclose a reason for [No.P.'s] separation from his brothers and sisters." A memorandum in support of the petition "must provide a summary of the significant facts, limited to matters in the record." (Cal. Rules of Court, rule 8.452(b)(1).) It must also "support any reference to a matter in the record by a citation to the record. The memorandum should explain the significance of any cited portion of the record . . . ." (Cal. Rules of Court, rule 8.452(b)(3).) Here, mother failed to identify the juvenile court order that she challenges; identify the "reports" she contends should have stated, but failed to state, the reason why the children were not placed together; summarize the significant facts of that claim; cite to the record; explain the significance of any cited portion of the record; or otherwise develop her argument. We therefore do not consider mother's contention concerning alleged deficiencies in the reports relied upon by the juvenile court. (*Miller v. Superior Court* (2002) 101 Cal.App.4th 728, 743.)

### B. Offer of Proof

Mother also contends that the juvenile court erred when it required an offer of proof from her counsel prior to setting a contested section 366.26 hearing. We disagree.

Mother did not object to having to provide an offer of proof during the hearing. "When a party does not raise an argument [before the trial court], he may not do so on appeal. [Citations.]" (*People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13, disapproved on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "'A party is not permitted to change his position and adopt a new and different theory on appeal. To permit him to do so would not only be unfair to the trial court, but manifestly unjust to the opposing litigant.' [Citation.]" (*Expansion Pointe Properties Limited*

*Partnership v. Procopio, Cory, Hargreaves & Savitch, LLP* (2007) 152 Cal.App.4th 42, 54-55; *In re Michael L.* (1985) 39 Cal.3d 81, 88; *In re Christopher B.* (1996) 43 Cal.App.4th 551, 558.)

Even if mother did not forfeit her contention, her contention fails on the merits. Mother argues, "the juvenile court cannot require a party to *a review hearing* to tender an offer of proof as a condition to obtaining a contested hearing" (*In re James Q.* (2000) 81 Cal.App.4th 255, 266, italics added.)  The juvenile court however may require an offer of proof prior to setting a contested section 366.26 hearing.  (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1116.)  "Because due process is . . . a flexible concept dependent on the circumstances, the court can require an offer of proof to insure that before limited judicial and attorney resources are committed to a hearing on the issue, mother had evidence of significant probative value.  If due process does not permit a parent to introduce irrelevant evidence, due process does not require a court to hold a contested hearing if it is not convinced the parent will present relevant evidence on the issue he or she seeks to contest.  The trial court can therefore exercise its power to request an offer of proof to clearly identify the contested issue(s) so it can determine whether a parent's representation is sufficient to warrant a hearing involving presentation of evidence and confrontation and cross-examination of witnesses." (*Id*. at p. 1122.)  The juvenile court did not err by requiring mother's counsel to make an offer of proof prior to setting a contested section 366.26 hearing.

### C.     Visitation Order and Orders Denying Section 388 Petitions

Mother contends that the juvenile court erred by ordering on January 27, 2011, that mother have approximately one visit a year with No.P., and denying mother's section 388 petitions on September 11, 2012, November 5, 2012, and January 3, 2013, requesting additional visits with No.P.  A visitation order is an appealable order (§ 395; *In re Melvin A*. (2000) 82 Cal.App.4th 1243, 1250) as is an order denying a section 388 petition (§ 395; *In re Madison W*. (2006) 141 Cal.App.4th 1447, 1450).  Mother never appealed the

visitation order or the orders denying her section 388 petitions.  We therefore do not entertain mothers contentions regarding those orders in this writ proceeding.

### D.     Order of No Contact and Setting Permanent Plan Hearing

Mother contends that the juvenile court abused its discretion in issuing its June 6, 2013, order that mother shall not have contact with No.P. pending further order from the juvenile court, and setting a permanent plan hearing under section 366.26 as to No.P. According to mother, "[T]here was no evidence that visitation presented harm to [No.P.]."  We disagree.

A juvenile court's ruling is an abuse of discretion when it is arbitrary, capricious, or patently absurd.  (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)  The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason, and when two or more inferences can reasonably be deduced from the facts, we have no authority to substitute our decision for that of the juvenile court.  (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.)  After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Instead, "the focus shifts to the needs of the child for permanency and stability."  (*In re Marilyn H*. (1993) 5 Cal.4th 295, 309.)

In challenging the June 6, 2013, order, mother essentially contends that the juvenile court erred by ordering on January 27, 2011, that mother have one visit a year with No.P.,[3] and thereafter by denying mother's section 388 petitions, discussed above. Mother's August 9, 2012, section 388 petition requested that she have overnight weekend visits with No.P.  In support of that petition, mother notes that she had enrolled in a parenting class and was renting a two-bedroom apartment with her fiancé.  Mother's October 1, 2012, section 388 petition again requested that she have overnight weekend

---

[3]     Although mother appears to challenge the January 27, 2011, order that mother have one visit a year with No.P., prior to June 6, 2013, when the juvenile court ordered that she was not to have any contact with No.P., mother was permitted to visit No.P. every other month.

visits with No.P. because, as mother reiterated, she enrolled in parenting classes, and she only had been granted one visit per year with No.P.  Mother's December 3, 2012, section 388 petition requested that she have weekend visits with No.P. because mother completed her parenting classes and individual counseling.  The juvenile court denied the petitions, finding on each occasion that the requested modification to the visitation order was not in No.P.'s best interest.

As discussed above, a visitation order and an order denying a section 388 petition are appealable orders.  (§ 395; *In re Madison W.*, *supra*, 141 Cal.App.4th at p. 1450; *In re Melvin A.*, *supra*, 82 Cal.App.4th at p. 1250.)  Because mother never appealed those orders, she is bound by the findings in those proceedings.  (*People v. Carter* (2005) 36 Cal.4th 1215, 1240 [collateral estoppel]; *In re Matthew C.* (1993) 6 Cal.4th 386, 393 157 ["the issues determined by" an appealable order from which a timely appeal was not taken "are res judicata"], superseded on other grounds as stated in *People v. Mena* (2012) 54 Cal.4th 146; *Bernhard v. Bank of America* (1942) 19 Cal.2d 807, 813 [res judicata]; *Nein v. HostPro, Inc.* (2009) 174 Cal.App.4th 833, 845 [collateral estoppel]; *Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 532 ["'A judgment or order . . . become[s] res judicata [when] it is final in the. . . sense of being free from direct attack'"]; *Wanda B. v. Superior Court* (1996) 41 Cal.App.4th 1391, 1396 [the issues determined by an appealable order "are res judicata" if not timely appealed].)

In addition, mother had more than four years to reunify with No.P. but failed to do so.  No.P. came to the attention of the Department and the juvenile court when he was two years old.  The juvenile court sustained the petition alleging, inter alia, that mother physically abused C.P., P.U., Na.P., and J.P., declared mother's children dependents of the court, and granted mother family reunification services.

As of the sixth month review hearing, mother visited No.P. on one occasion, had not contacted No.P.'s caregiver to schedule any additional visits, and failed to participate in her court-ordered services.  Accordingly, in November 2009, the juvenile court terminated mother's family reunification services.

During the fourteen months following the termination of mother's family reunification services, mother had not visited with No.P., made no efforts to reunify with No.P., and did not appear at the January 27, 2011, hearing. Mother's counsel informed the juvenile court she had no instructions from mother regarding the case. No.P.'s counsel informed the juvenile court that mother had not been visiting No.P., and the juvenile court ordered "once a year" visits for mother if mother so desired. Mother's counsel did not object to this visitation order.

By November 2011, two years after mother's family reunification services were terminated, mother had not visited with No.P. following her initial visit with him. About seven months later, mother appeared at the June 2012, hearing and inquired about regaining custody of No.P. The juvenile court stated that it had not terminated her parental rights, advised mother to start visiting No.P., explained to her that there could be more frequent visits if the initial visit went well, and told mother to stay in contact with the CSW.

In June 2012, mother had one visit with No.P., and No.P. was not responsive to mother during that visit. Mother had another visit with No.P. in February 2013; it lasted only about 30 minutes, and mother complained that No.P. was "not trying." The April 2013 visit was cancelled by mother when No.P. stated he did not want to attend. In May 2013, No.P. told the CSW he no longer wanted to visit mother.

After the termination of reunification services, "the focus shifts to the needs of the child for permanency and stability." (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 309.) The juvenile court properly focused on providing No.P. with permanency and stability and not subjecting him to situations that cause him stress and turmoil. Mother's visits with No.P. were infrequent, one of the visits lasted only about 30 minutes and mother became visibility upset during it, and No.P. has refused to visit with mother. No.P. was bonded with L.O. and L.O's boyfriend. No.P. was thriving in their care, and they expressed a desire to adopt No.P. The juvenile court did not abuse its discretion in ordering that mother shall not have contact with No.P. pending further order from the juvenile court, and setting a permanent plan hearing under section 366.26 as to No.P.

16

**DISPOSITION**

The petition for extraordinary relief is denied.  This opinion shall become final immediately upon filing.  (Cal. Rules of Court, rule 8.264(b)(2)(A).)

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

MOSK, J.

We concur:

TURNER, P. J.

KRIEGLER, J.